396 F.2d 601
 WBEN, INC., Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents.
ASSOCIATION ON BROADCASTING STANDARDS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Rockland Broadcasters et
al., Intervenors.
PACIFIC AND SOUTHERN COMPANY, Inc., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Association on Broadcasting
Standards, Inc., Radio Olean, Inc.,
TechelandBroadcasting, Inc.,
Intervenors.
KING'S GARDEN, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
GOLDEN PLAINS INCORPORATED, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Klamath Broadcasting Co., et
al., Intervenors.
 Nos. 346, 347, 402, 403, 409, Dockets 31688, 31835, 31923,
32018, 31988.
 United States Court of Appeals Second Circuit.
 Argued March 21, 1968.
Decided May 10, 1968, Certiorari Denied Oct. 21, 1968, See
89 S.Ct. 238, 240.
 
 Robert L. Heald, Washington, D.C. (Fletcher, Heald, Powell, Kenehan & Hildreth, Washington, D.C., Frank U. Fletcher, Edward F. Kenehan, James P. Riley, Washington, D.C., on brief), for petitioner WBEN, Inc.
 William J. Potts, Jr., Washington, D.C. (Michael H. Bader, Washington, D.C., on brief, for petitioner Ass'n. of Broadcasting Standards.
 Morton L. Berfield, Washington, D.C. (Cohen & Berfield, Washington, D.C., Lewis I. Cohen, Gennaro D. Caliendo, Washington, D.C., on brief), for petitioner King's Garden, Inc.
 John L. Tierney, Washington, D.C. (McKenna & Wilkinson, Washington, D.C., James A. McKenna, Vernon L. Wilkinson, Washington, D.Ct., on brief), for petitioner Golden Plains, Inc.
 Lauren A. Colby, Washington, D.C., for Intervenors Rockland Broadcasters, Ubiquitous Coup., Christian Broadcasting Corp., 5 KW, Inc., Heart of Georgia, Inc., Three Towers, Inc., Bexar Broadcasting Co., Inc., and others.
 McKenna & Wilkinson, Washington, D.C., on the briefs, for intervenor American Broadcasting Co., Inc. and for intervenors Klamath Broadcasting Co., Plains Radio Broadcasting Co., Golden West Broadcasters et al.
 John H. Conlin, Associate General Counsel (Henry Geller, General Counsel, William L. Fishman, Counsel, Donald F. Turner, Asst. U.S. Atty. Gen., Gregory B. Hovendon, Attorney, Department of Justice, Washington, D.C.), for respondents Federal Communications Commission and United States of America.
 Before LUMBARD, Chief Judge, and FRIENDLY and ANDERSON, Circuit judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 As a result of proceedings in several courts of appeals unnecessary to detail we have before us a number of petitions, under 28 U.S.C. 2342(1), for review of orders of the Federal Communications Commission, reported in 8 F.C.C.2d 698 (1967), and 10 F.C.C.2d 283 (1967), which amend Part 73 of the Commission's Rules so as to establish a changed pattern for presunrise operation by certain classes of AM radio stations. While the petitions raise many substantial queastions, both substantive and procedural, which have demanded extensive consideration and discussion, we sustain the Commission.
 
 
 2
 From its very beginning, federal regulation of standard AM radio service has been complicated by the fact that radio waves do not act in the same way when the sun is up as when down. During the day, the part of the radio signal directed skyward (the 'skywave') is dissipated in the atmosphere, and only the portion moving parallel to the ground (the 'groundwave') provides useful service. At night, however, the ionosphere reflects the skywave signal back to earth, and if the skywave is strong enough, a station can land an audible signal in large areas that its ground wave does not reach. This, however, is not an unmixed blessing. If the skywave lands in an area already receiving service from another station on the same frequency, the two signals may destroy one another so that only garbled noises will be audible.
 
 
 3
 The Commission has attempted to fashion a nighttime allocation pattern that will maximize the number of listeners who will benefit from skywave service and yet permit as many listeners as possible a wide choice of program, preferably of nearby origination. The AM band has been divided into three parts for these purposes. On 46 Clear Channels wide area service is the Commission's dominant goal. Twenty-four of these channels are occupied by one Class I-A station of high power, whose skywave and groundwave are given maximum protection. 47 C.F.R. 73.25(a) (1967). At the most, only one other station in Class II is permitted to operate at night on these channels, and the power and direction of the subordinate station's signal is limited so that it will not cause undue interference. Other Class II stations occupying these channels are limited to daytime broadcasting, where the skywave is of no concern. The other 22 Clear Channels are intended to serve the same purpose as the ones we have just discussed. They differ only in that each is occupied at night by two or more dominant stations in Class I-B and, often, by several subordinate stations in Class II.[1] The overwhelming majority of the Class II stations, however, are limited to daytime broadcasts.[2] By this careful allocation pattern, the Commission has succeeded in providing skywave radio service to some 20,000,000 persons who would not receive any groundwave signal at night.
 
 
 4
 Complementing the Clear Channel stations are the stations of moderate power in Class III that are located on 41 'regional' channels. These stations are expected to provide large numbers of listeners with one or more programs originating closer to home. Since many more stations occupy a given channel at night, regional broadcasters generally do not have a usable skywave service. 47 C.F.R. 73.182(e), (v) (1967). Steps must be taken, however, to guarantee that one station's skywave signal will not interfere with another's groundwave. Consequently, of the 858 Class III stations permitted to operate by night, only 90 operate with the same facilities they are allowed to use by day. Moreover, 1200 additional Class III stations are restricted to daytime only broadcasting to insure against interference.
 
 
 5
 To supplement the services provided by the regional broadcasters, a large number of low power Class IV stations are assigned to six local channels. Their night operations are limited in a similar manner.
 
 
 6
 The Commission's Earlier Efforts as to Presunrise Operation.
 
 
 7
 The shift from nighttime to daytime ionospheric conditions does not take place the instant the sun rises; instead, the skywave signal weakens gradually from two hours before dawn, and it is not until two hours after sunrise that true daytime condictions exist. It is the Commission's effort to regulate broadcasting during the transitional presunrise period with which we are here concerned. In 1941, the agency promulgated special rules, which remained substantially intact until the rule-making proceeding now under review, to govern the conflicting interest of daytimers and fulltimers during the pre-dawn hours of transition. Under old rule 73.87, quoted in the margin,[3] all restricted stations, except for those in Class IV and certain ones in Class II, could begin broadcasting at full daytime power from 4 A.M. If, however, undue interference to fulltime stations resulted, the Commission had the right to suspend such pre-dawn operations summarily, pending a hearing on the interference question. Music Broadcasting Co. v. F.C.C., 95 U.S.App.D.C. 12, 217 F.2d 339 (1954). Although the principal beneficiaries of the rule were Class III stations whose nighttime operations were limited or banned entirely, a substantial number of Class I-B and Class II stations took advantage of its provisions as well.
 
 
 8
 While this system worked relatively well during its early years, it was subjected to increasing strain as the number of AM stations increased from 882 in 1941 to the present 4250, and the number of daytimers mushroomed from 60 to 2180. Interference complaints from dominant fulltimers naturally increased, leading to summary termination of the daytimers' pre-dawn services. Indeed, some of the fulltimers on the particularly crowded regional channels indicated they would complain more often but for the fact that the airwaves had become so full that it was impossible to identify the interfering daytimer within a reasonable period of time. Moreover, it was reasonable to expect that the fulltimers would exercise increasing vigilance over their channels for the presunrise hours had taken on a new economic importance in an era in which the largest radio audiences were to be reached during the time America was driving to work.
 
 
 9
 The daytimers, too, were becoming increasingly restive with the terms of a compromise which promised to become increasingly unfavorable to their interests. In 1957, the Commission began a study of a proposal, sponsored by their Association, which would have given them the right to operate from 5 A.M. to 7 P.M. regardless of the amount of interference this would cause the dominant fulltimers. This was rejected in 1958, Daytime Standard Broadcast Stations, 17 R.R. 1669. A somewhat more modest proposal, permitting operation from 6 A.M. to 6 P.M., suffered a similar fate a year later, Extended Hours for Daytime Operation, 26 F.C.C. 53.
 
 The Instant Proceedings
 
 10
 In 1960, however, the old regime was again put into question when the Senate ratified a new North American Broadcasting Agreement which, as we shall describe at a later point, made it clear that the presunrise operations of at least half of the stations taking advantage of Rule 73.87 were in violation of our international commitments. In response to the treaty and to the complaints of the fulltimers, the Commission issued a Notice of Proposed Rule Making on December 6, 1961, which initiated the proceedings now under review. This proposal would have revised the status quo in the fulltimers' favor. The plan would have forbidden presunrise broadcasting by all restricted stations, except those Class III stations already operating. As to these, the Commission proposed new rules which would have made it much easier for dominant stations to establish their interference claims.
 
 
 11
 The daytimers were not inactive in the face of this threat. On July 2, 1962, the House of Representatives passed a bill, H.R. 4749, which would have permitted daytimers of whatever class to begin broadcasting at full power at 6 A.M., or 4 A.M. if they had done so before, where there was no fulltimer operating in the same community. Affected fulltimers were required to make a substantial showing of interference before they would have a right to a gearing and this, unlike the summary procedure under Rule 73.87, would lead to termination of the daytimer's service only if the Commission found that the latter did not better serve the public interest.[4]
 
 
 12
 In response to this legislative effort, which the agency opposed and which died in the Senate, the Commission issued a Further Notice of Proposed Rulemaking. This sought to recognize the daytimers' claim, aired both in Congress and in the prior rulemaking proceedings, that because they broadcast information of great importance to their local communities, they should be permitted to broadcast during the early morning hours regardless of the interference this would cause the fulltimers, whose broadcasting could not take into full account the needs of all the communities that were dependent upon them at night. The Commission recognized, however, that though the local service of the daytimers was valuable, these stations could not be permitted to broadcast during the pre-dawn hours on the same basis that they did by day. For the studies it had made in its prior proceedings indicated that, because of skywave interference, the number of listeners who would be deprived by interference of service provided by the fulltimers would 'far exceed' the number of listeners who would gain by the distinctive character of the daytimers' local coverage. Consequently, to cut down service losses to an acceptable figure, the Commission proposed to limit the daytimers' presunrise operation in four ways. First, it would permit only those daytimers located in a community which was not served by a local fulltimer to operate before dawn. Listeners located in other areas, it reasoned, already had access to early morning local news. Second, it proposed that the daytimers' power should be no more than 500 watts during the transitional period. This, it suggested, was enough to reach the local community. Third, daytimers could not begin operating before six in the morning. Finally, the dispensation was limited to those daytimers in Class III who occupied regional channels on which fulltimer skywave service was not a factor. As for Class II daytimers, occupying 'Clear Channels,' a different regime would apply. Only those daytimers located to the west of all dominant Class I stations could broadcast before dawn but, in contrast to the system for Class III, no fixed starting time or power limitation was set. Rather daytimers in this class could begin operations at the time the sun rose at the westernmost Class I station-- for at that time much of the dominant station's skywave would become useless.
 
 
 13
 Comments were invited and some 300 stations responded formally, as did the associations representing interested groups of fulltimers and daytimers. On June 28, 1967, after negotiating a supplementary agreement with Canada consistent with its disposition, the Commission reached its decision, which, in general, favored the daytimers more than its original proposal. While the limitations on starting time and power[5] were retained for Class III stations, all daytimers of this class were permitted to take advantage of the new rule. The new dispensation was also broadened to include the many Class III fulltimers whose operations were restricted at night, thereby permitting them to offset in some cases the impact of the increased interference the daytimers would cause. Class II stations were treated much more restrictively, in keeping with the Commission's effort at maintaining the integrity of skywave service on Clear Channels. Class II stations located on a I-B channel, which under FCC regulations may be authorized to broadcast during the day with up to 50,000 watts power, could begin their daytime broadcasting at 500 watts at 6 A.M., provided this was later than sunrise at the westernmost Class I station to the east. However, one important limitation on this authority was imposed-- only such power could be used as did not interfere with the skywave service procided by the dominant stations located to the west, where the sun had not yet risen. Class II stations operating on a domestic I-A channel were treated differently. If they were located to the east of the dominant station, no presunrise operations were to be permitted at all; if to the west, they could begin operating at full daytime power from 6 A.M. or sunrise at the dominant station (whichever was later), pending decision in another proceeding as to whether a limitation on power was appropriate on these channels as well.
 
 
 14
 Thus, the Commission's decision alters the prior allocation pattern decisively. Limited pre-dawn broadcasting rights are granted daytimers on a broad scale where formerly more ample privileges had been granted on the sufferance of the increasingly vigilant fulltimers.
 
 The Positions of the Parties
 
 15
 Like all compromises this has not succeeded in pleasing everybody. Some fulltimers complain that daytimers are allowed to operate too much and some daytimers complain that they are allowed to operate too little. Specifically WBEN, a full time Class III station, and the Association of Broadcasting Standards, Inc.-- a group representing Class II and Class III stations operating both day and night-- object insofar as daytime operation is permitted from 6 A.M. regardless of the amount of interference to a fulltimer's signal this might cause. On the other hand, a number of Class II and Class III stations, whose operations are either limited[6] or banned[7] at night, protest because they had previously been broadcasting between 4 A.M. and sunrise at their full daytime power and the decision has forced them to curtail their operations although no fulltimer has complained of their causing undue interference. A third group of stations have intervened in support of the order.[8] Their position is explained by the fact that when the Commission inaugurated these proceedings, it forbade any new restricted stations licensed after January 29, 1962, from broadcasting before sunrise; such stations naturally welcome a decision that permits them to broadcast presunrise on the same basis as their elders. Since no complaint is made by the Class I stations we must assume that the decision adequately protects their presunrise skywave service.
 
 
 16
 The Claim of Arbitrary and Capricious Action
 
 
 17
 We address ourselves immediately to perhaps the most serious question in the case-- the contention of the fulltimers that, despite the length of the Commission's opinions, the new rules are based on an analysis so scanty and superficial as to be arbitarary and capricious. They point to the Commission's admission that 'it may well be true, as (the fulltimers) urge, that the losses will often, perhaps usually, exceed the gains if strict engineering standards are applied,' and argue that, this being so, the Commission was obliged to estimate with precision the number of listeners who would gain and lose service as a consequence of its decision before it could rationally proceed. The agency responds that its analysis of the qualitative differences in the needs of the various classes of listeners affected was sufficiently compelling that it could rely on its expertise to form a rough assessment of their number.
 
 
 18
 In order to assess the weight of these competing claims, it is necessary to outline the Commission's analysis. As the fulltimers' more substantial complaint centers upon the Commission's failure to quantify the number of listeners they will lose, we shall consider this point first.
 
 
 19
 Listeners of two types will lose fulltimer service between 6 A.M. and sunrise as a result of the Commission's decision. First, interference will sometimes deprive listeners relatively near the transmitter of local broadcasts. Second, service to contiguous rural areas will be impaired. As to nearby listeners, the Commission argues that since fulltimers are generally located in cities of substantial size, provided 'with a plethora of locally originated services,' the loss of service to some listeners should be discounted by the fact that local programs on other frequencies will be generally available to them. The agency points out that of the 107 communities served by Class III fulltimers filing comments in this proceeding, only 16 rely exclusively upon one nearby fulltimer.[9] This distribution pattern, it claims, is typical of its general experience, and reveals the inadequacy of a decision based principally on a head count. While many of the fulltimers made detailed showings as to the number of listeners deprived of their own services, only one, WREC, made a similar showing as to the number of listeners deprived of all groundwave service. Moreover, the Commission pointed out that the amount of FM service available to fulltimer communities exceeded that available to areas served only by daytimers.[10]
 
 
 20
 Turning to the rural areas served by Class III fulltimers, the Commission also stressed that because of the distribution of these stations, alternative regional services will often be available. In addition, '(with) few exceptions the fulltimers did not establish the extent to which listeners in such areas (usually at some distance from the station) actually rely on and need their service.' Although it was not explicitly stated that Class I stations had made satisfactory showings in this respect,[11] the Commission relied on the service, both groundwave and skywave, provided by these stations to cushion the loss.
 
 
 21
 It thus becomes clear that the agency's decision on this aspect of the case hinges upon its claim that the listener who will lose the service of a regional fulltimer will generally have reasonably satisfactory alternative broadcasting available. Since this is a valid consideration, if the Commission were required to quantify the number of listeners who would lose service, it would not be sufficient to know that the signal of any particular station was going to be destroyed over a given area but how all the available signals would be affected. Yet to determine this would be an enormous task, and one on which the parties have not assisted the Commission in any meaningful way.
 
 
 22
 When seen from this perspective, the most persuasive argument made by the fulltimers in support of their position falls. They point out that in its earlier decisions of 1958 and 1959, in which similar daytimer claims for presunrise operation were rejected, the Commission demonstrated no similar reluctance to estimate the number of listeners who stood to lose by the grant of a general dispensation. And the fulltimers urge that the agency's headcounts in these proceedings demonstrate that the reason for the failure to undertake a similar study in this proceeding was the Commission's awareness that such a count would show service losses so outstripping gains that no 'qualitative analysis' would permit it to reach the desired conclusion.
 
 
 23
 However, the Commission's conscientious efforts at quantification in its earlier proceedings show rather the difficulty of deriving figures really relevant under its present analysis. In its 1958 decision, rejecting a uniform starting time of 5 A.M., the Commission was capable of quantifying the service loss that each of 168 stations, submitting data on the question, would suffer two hours before sunrise. However, it was unable to determine on the basis of this data and certain other submissions directed precisely at this point, the number of listeners who would be without any A.M. groundwave service at all. Instead, much as was done here, the Commission made a rough assessment on this issue concluding simply that 'very considerable' areas would be so deprived. 17 R.R. at 1679. The Commission's decision a year later, in which a 6 A.M. starting time was rejected, treated the question similarly. It could only enumerate the '25,631,000 persons in 1,727,000 square miles, now receiving skywave service' who it could predict 'would lose entirely the standard broadcast service now available to them.' 27 F.C.C. at 60.
 
 
 24
 But this finding is of no use to petitioners. For the rule adopted in the present proceeding differs from those previously considered precisely in that it forbids presunrise operations by those Class II daytimers who would interfere with the skywave service provided by the stations in Class I. Moreover, the present rule, unlike its proposed predecessors, also protects the groundwave service provided by Class I stations. This undermines the force the fulltimers would have us give the service loss calculations made in earlier proceedings. For example, the fulltimers emphasize particularly the Commission's 1958 conclusion that 24 fulltime stations could no longer reach 27,513,881 persons by groundwave if all daytimers in Classes II and III would be permitted to broadcast one hour before sunrise. But of the 24 stations providing the Commission with this information, only eight were on regional channels-- and these accounted for only 2,264,000 of the potential listeners, 8% Of the total loss.[12] Even this figure, as we have suggested, does not indicate the number of persons deprived of all groundwave service by the Commission's present decision-- rather it represents the aggregate of the loss suffered by each station taken individually. For example, WAMP, one of the eight regionals submitting data, reported that it would lose 885,000 potential listeners one hour before sunrise, a figure amounting to one third of the total Class III loss. However, this station is located in Pittsburgh, Pa. and the Pittsburgh area is also served by a Class I-A station, KDKA, which also claimed a loss in its groundwave service area of 3,242,000 listeners. Since this service would remain intact under the Commission's present proposal, it is highly unlikely that the listeners deprived of WAMP's service, whatever their number, will lose touch with Greater Pittsburgh entirely. We do not pretend to judge the comparative merits of WAMP and KDKA, or indeed whatever other radio services are available in the Greater Pittsburgh region. We only point to the WAMP case as supporting our conclusion that the Commission was not arbitrary in refusing to rely on an earlier headcount whose relevance to the present proposal was so limited.
 
 
 25
 An additional consideration justified the Commission's refusal to attempt to quantify the relevant losses and further undermines the asserted cogency of its earlier figures. The earlier calculations were based upon two series of technical data. One series calculated losses on the basis of curves that represented true nighttime propagation conditions, which have been established in the agency's rules. 47 C.F.R. 73.90 (1967). In the Further Notice in the present proceeding, however, the Commission announced that it did not believe that these curves accurately reflected the extent of interference occurring during the presunrise transitional period. To avoid the burden of developing a new set of standards, which would require collection and analysis of a great volume of statistical data, the Commission proposed to apply a set of standards it had developed in an earlier proceeding, Daytime Skywave Transmissions, 18 R.R. 1845 (1959). These guidelines, however, were based upon data measuring interference during the transitional period after sunset, and comments attacked their validity on the ground that they did not accurately reflect conditions obtaining before sunrise. The Commission was thus persuaded that it could not coscientiously proceed along the lines it had contemplated, and that an attempt to collect and degest new data would unduly protract and already lengthy proceeding.
 
 
 26
 The fulltimers contend that in the absence of other satisfactory data, the Commission was bound to apply the strict nighttime standards announced in its Rules to calculate the amount of injury they would be caused even though these would overstate the case. We do not see why. Hall v. F.C.C., 99 U.S.App.D.C. 86, 237 F.2d 567 (1956), on which they rely, does not stand for this proposition. There the Commission claimed the right to depart from its technical standards in a television licensing proceeding even thoufh it conceded that these were accurate to a high degree of probability. The court held that, given this concession, the agency was obliged to demonstrate that what was highly probable was not in fact the case. Compare National Broadcasting Co. v. F.C.C., 124 U.S.App.D.C. 116, 362 F.2d 946, 957 (1966). Here, on the other hand, even the petitioners agree that strict nighttime standards are unreliable. Noreover, the fulltimers were alerted by the Commission's Further Notice of 1962 that the technical issue was to be canvassed. Yet it was only in July 1966 that the Association for Broadcasting Standards submitted a fragmentary study on presunrise propagation conditions. The Commission was fully justified in refusing to consider that this late submission required it to undertake a lengthy full scale inquiry at that time. Compare W.S. Butterfield Theatres, Inc. v. F.C.C., 99 U.S.App.D.C. 71, 237 F.2d 552 (1956).
 
 
 27
 It is true, of course, that the Commission is not limited to the evidence submitted by the parties and is obliged to make those determinations which are necessary to satisfy it that the public's interest will be served. But under the circumstances we have described, we cannot say that the Commission's decision to proceed without precise figures whose compilation might take years was arbitrary or capricious. Compare Television Corp. of Michigan, Inc. v. F.C.C., 111 U.S.App.D.C. 101, 294 F.2d 730 (1961).
 
 
 28
 Our conclusion is buttressed by the fact that the Commission's present decision did take the fulltimers' interests into account in several salient respects. Not only were the Class I stations carefully protected, but daytimers of both classes were forbidden to broadcast during the period before 6 A.M., when true night time conditions were more closely approximated. Moreover, all presunrise operations on the regional channels were limited to a maximum of 500 watts power, one tenth that generally used by many of the important daytimers, so that, as the Commission found, the proposed rules 'may well improve present interference conditions' in many areas. While the fulltimers deny that the power limitation will be of much importance and point to the Commission's statement in 1959 'that power reduction poses only an extremely limited potential for alleviating the interference problem,' 27 F.C.C. at 58, it is clear, when this statement is read in context, that the agency was there concerned with the peculiar susceptibility of skywave service to interference and was not saying that power reduction would not reduce interference with the groundwave.
 
 
 29
 The fulltimers' other claim, that the Commission was obliged to quantify the number of listeners who would gain from its decision, is weaker than the one we have just rejected. The Commission found that the daytimers had demonstrated a real need for relatively early broadcasts of school closings, traffic conditions and weather reports in the areas they served. It also found that 61% Of the communities in which the daytimers were located did not have a fulltimer either in the town itself or in its 'urbanized area,' and that it would cause too many administrative difficulties to exclude the other daytimers from the dispensation, when, in any event, they would be performing important services-- indeed, services, in some cases, on which listeners had relied for years. Moreover, a limited engineering study had given it cause to believe that the interference the additional stations would cause would 'not necessarily be great.'
 
 
 30
 The fulltimers question this determination of need by citing the Commission's 1959 finding that of the 912 communities in which a daytimer, but not a fulltimer, was then located, '357, or 39.1 percent, with a population total of 1,761,622 do not receive nighttimer groundwave service from any stations; that 218, or 23.9 percent, with a population total of 1,684,026 receive nighttime groundwave service from one station; that 337, or 37 percent, with a population total of 5,218,854 receive nighttime groundwave service from two or more stations; and that many of the communities are nearby suburbs of well-served metropolitan areas.' Id. at 57. These figures are to a considerable extent incommensurable with the figure given in the present decision since the 61% Does not include those communities receiving groundwave signals from within their urbanized areas and includes only those localities served by Class III daytimers. They are also obsolescent-- in 1958 there were only 1400 daytimers, compared with 2190 today. See Daytime Standard Broadcasting Stations, 18 R.R. 1689, 1692 (1959). Moreover, it is clear that the Commission had a firm grasp as to the order of magnitude of the listeners gaining services and the fulltimers are using the older figures simply to challenge the agency's order of priorities. As the history of presunrise regulation demonstrates better than anything else, both daytimer and fulltimer have legitimate claims to the use of the AM band during the transitional hours and we cannot fault the Commission for believing a compromise between these competing claims constitutes the best solution. If experience should show the particular compromise here adopted to be less beneficial than the Commission believes, the road to change is always open.
 
 Sections 303(f) and 307
 
 31
 As a part of their substantive attack the fulltimers seek to invoke two statutory provisions. They argue that 303(f)'s[13] command that the Commission 'make such regulations * * * as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter' permits it to make a decision increasing interference only when this step is justified by one of the other specific provisions of the Act. However this may be, we find that 303(c),[14] giving the Commission the power to 'assign bands of frequencies to the various classes of stations' and to set each station's starting time gives the Commission ample authority to proceed as it has done. There is even less appeal in the claim based on the general provision of 307(b)[15] requiring the Commission to distribute licenses so as to provide 'a fair, efficient, and equitable distribution' of radio service to the various parts of the nation. That is precisely what the Commission has endeavored to accomplish. There is equally little force in the complaint of the daytimers and the limited fulltimers who are being obliged to cut back their presunrise operations that 307(b) has been violated. we cannot find that the agency's conclusion that a limited presunrise service distributed widely throughout the nation is more 'equitable' than a more generous dispensation limited to an ever diminishing number of localities is irrational.
 
 The Ageement with Canada
 
 32
 Both groups of petitioners challenge the merits of the decision on another ground. The Commission found that at least half of the presunrise operations permitted under the old rule violated our undertakings to Canada in the North American Regional Broadcasting Agreement (NARBA), ratified by the Senate in 1960, which guaranteed that American radiation would not interfere unduly with Canadian stations. See Annex 2, c and Appendix B, 11 U.S.T. & O.I.A. 415 (1960). It also concluded that any scheme permitting substantial amounts of presunrise broadcasting by daytimers would lead to wholesale NARBA violations. Consequently, before the F.C.C. reached its decision, the United States concluded a bilateral agreement[16] with Canada enunciating standards consistent with the Commission's ultimate disposition in this proceeding.
 
 
 33
 The fulltimers read the present decision as finding in this recent Agreement the principal justification for its new rules, and contend that, if the Agreement was invalid, the rest of the structure must fall. We do not so read the decision. The Commission specifically explsined, in its Memorandum Denying Reconsideration, that it initiated the Canadian talks only after reaching its tentative conclusions, and we have held that the rest of its analysis is sufficient to support its present course.
 
 
 34
 We also find no merit in the claim that the Agreement violates NARBA and has not been ratified by the Senate. The fulltimers point to the restrictions on night operation and to the definition in Annex 2 of NARBA:
 
 6. Daytime and Night-time Operation
 
 35
 (a) Daytime operation in general means operation between the times of local sunrise and local sunset at the transmitter location of the station; however, in particular cases other hours for daytime operation may be established, either in the present Agreement or in bilaterial agreements, between the respective Contracting Governments, taking into account the location of the station it is intended to protect.
 
 
 36
 The Canadian Agreement permitting limited presunrise operation, it is argued, does not fall within the proviso because rather than dealing with 'particular cases,' it enumerates entire classes of stations whose operations would be permitted. We see no force in this argument. If Canada was willing to permit a large number of stations to operate presunrise, surely it was entitled to say so in a coherent fashion rather than approve each one as proposed. Moreover, the recent Agreement does not unequivocally grant permission to entire classes of stations-- rather, each Government reserves the right to object to a particular operation within sixty days after it has been notified of its existence. Our view is further supported by G of NARBA which provides that:
 
 
 37
 Contracting Governments may settle their differences on questions relating to the interpretation or execution of this Agreement through diplomatic channels or by any other method mutually agreed upon. * * *
 
 
 38
 In fact, the successful conclusion of the Canadian Agreement powerfully supports the Commission's solution-- for the first time presunrise operations have been placed on a basis consistent with our international obligations.
 
 
 39
 Paradoxically, the daytimers and restricted nighttimers join in their brothers' attack on the new Agreement. However, we do not understand how the liberalization of NARBA can even be claimed to have affected their interests adversely. The contentions of two stations require special mention: KMMJ, a Class II daytimer in Grand Island, Nebraska, has begun full daytime operations at the time the sun rose in Atlanta, Georgia, the site of the dominant Class I-A station on its channel. In its Further Notice, the Commission indicated that, as its proposal then stood, stations in KMMJ's position could continue signing on as in the past. Thus assured, KMMJ did not file a comment in the proceeding, and claims the public notice provisions of 4 of the APA protect it against that aspect of the Commission's decision which permits Class II stations like KMMJ to begin groadcasting only at 6 A.M., despite the fact that the sun rises as early as 5:15 A.M. in Atlanta. The Canadian Agreement enters the picture because of the Commission's response that the uniform 6 A.M. starting time is mandated in the Canadian Agreement and KMMJ had no right to notice since 4 of the APA does not apply to agency proposals insofar as they involve a 'foreign affairs function.' 4(a)(1). While this response seems dubious since the Canadian Agreement does not explicitly prohibit daytime operations before 6 A.M. but simply permits post-6 A.M. operations under standards more liberal than those in NARBA, we find KMMJ's claim defective on another ground. The Commission made clear that it did not intend to limit the proceeding to consideration of its own proposal, but that what was involved was 'a basic policy judgment as to the terms and circumstances under which an extension of daytime only operation would be permitted.' King's Garden Inc., the licensee of a Class III daytime station, KGDN, located in Edmonds, Washington, complains that, under the new rules, it will be permitted to broadcast before sunrise only subject to a power limitation of 58 watts, required by the new Agreement with Canada and that it was not notified of the agency's intention to negotiate a new agreement. But here the Commission is on firm ground in suggesting that the 'foreign affairs' exception to the APA applies. Moreover, KGDN has no cause for complaint since the NARBA standards would have been even more severe.[17]
 
 Challenges on Procedural Grounds
 
 40
 Both groups of petitioners make fundamental challenges to the procedural aspects of the present proceeding. They argue, from their different vantage points, that the Commission had no right to depart from the status quo in a rule making proceeding based upon the general characteristics of broad classes of radio stations. Instead, they contend, before the Commission could increase interference (in the case of the fulltimers) or limit a station's power and time of operation (in the case of daytimers and restricted nighttimers formerly operating under Rule 73.87), the Act requires it to concuct a multitude of evidentiary hearings in which the particularized conflicts between daytimer and fulltimer are analyzed.
 
 
 41
 The Commission rejected this approach not only because of the enormous number of hearings that would be required but also because as the skywave signal of a given daytimer often interferes with the signal of more than one fulltimer and vice versa, such proceedings would be complex multi-party affairs, which could well demand elaborate inquiry into the comparative merits of competing applicants for presunrise authority. Given its past unhappy experience, the Commission was on solid ground, as a matter of good sense, in concluding that 'a more particularized approach * * * would (not) throw significantly more light on the appropriate course of action in a given situation, anything like enough to warrant the burden involved.' Moreover, pursuing the course the petitioners suggest would indefinitely prolong an allocation scheme in blatant disregard of our international obligations. Neither daytimers nor fulltimers seriously suggest the Commission has mistaken the consequences of pursuing the case by case approach. Their argument is rather that, despite the seemingly broad rule-making power confided by 303(r),[18] Congress has required the agency to conduct such individual hearings even if the administrative heavens fall. Their contentions sharply pose the issue whether provisions for general rule making by administrative agencies are to be applied in their apparent breadth or are limited by other statutory provisions seemingly framed to deal with the different problem of individual applications. In resolving the conflict it is well to remember that Congress could hardly have intended to deprive administrative agencies of ability to administer. See Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (U.S. May 1, 1968).
 
 
 42
 The fulltimers first contend that 316, dealing with modification of licenses,[19] requires separate evidentiary hearings where as here the Commission's rule is to take effect immediately, resulting in increased interference during the life of their present licenses. But no case cited to us has held that 316 thus disables the agency in the exercise of its rule-making powers. Rather, in the only decision in point, the Ninth Circuit upheld the Commission's modification of existing license rights by rule, declaring that 316's 'primary function is to protect the individual licensee from a modification order of the Commission and is concerned with the conduct and other facts peculiar to an individual licensee.' California Citizens Band Association v. United States, 375 F.2d 43 (1967), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). The decision draws the proper line. Adjudicatory hearings serve an important function when the agency bases its decision on the peculiar situation of individual parties who know more about this than anyone else. But when, as here, a new policy is based upon the general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them. See 1 Davis, Administrative Law Treatise 6.13 at p. 147 (1965 pocket part) and 7.01.
 
 
 43
 The case law has been moving in this direction. United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), held that despite the fact that what was then 309(b) of the Act required a 'full hearing' before a license application could be rejected, the Commission could summarily dismiss applications violating the Commission's 'concentration of ownership' rules-- subject only to conformance with provisions of the Commission's regulations allowing an applicant to seek a waiver of, or exception to, any rule. The Court reaffirmed the principle of the Storer case in FPC v. Texaco Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). We have sustained a rule modifying all existing licenses despite a statute requiring an evidentiary hearing for modification of a particular license, Air Line Pilots Ass'n v. Quesada, 2 Cir., 276 F.2d 892 (1960), as has the District of Columbia Circuit in American Airlines v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 628-629 (in banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed,2d 75 (1966). Cf. National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).
 
 
 44
 We see no reason why the principle of these cases should not apply here. The Commission's present rules contain a provision for waiver, 47 C.F.R. 1.3, similar to those relied on in the Storer and Texaco cases; we have no reason to doubt that if a particular fulltimer should be able to make a preliminary showing that presunrise authorization to a daytimer or limited nighttimer would cause a degree of harm not contemplated in the rule making, the Commission would hear him. As said by Judge Leventhal in the American Airlines case, supra, although 'the present case is different in particular aspects of the facts or statutory provisions from Storer and the other Storer doctrine cases,' the principle there established 'is not to be revised or reshaped by reference to fortuitous circumstances' but rests 'on a fundamental awareness that rule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy in guiding the future development of industries subject to intensive administrative regulation in the public interest.'The fulltimers urge that however all this might otherwise be, F.C.C. v. National Broadcasting Co. (KOA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943), requires a different result. But the case is in no way inconsistent with the position we have taken. While the Supreme Court there held that a license is 'modified' within the meaning of the statute whenever the Commission permits additional interference on the licensee's channel, the Court did not decide that a license can be modified only after an adjudicatory hearing as contrasted with rule making. The facts of the case did not present that question. WHDH had applied for a modification of its license under 309(a) to permit it to broadcast at night on the same channel as KOA in violation of the Commission's general rules, and KOA sought to intervene in the evidentiary hearing not only to present its argument on the general question of Clear Channel allocation that the proposed grant presented but also to argue that 'the service of WHDH, while interfering at night with that of KOA, would not be a service equally useful,' Id. at 244, and all agreed that an evidentiary hearing should be held to determine the merits on that issue. The Court decided only that when an adjudicatory hearing on an individual application was thus necessary, a licensee who would be aggrieved by the grant had the right to participate in it. This is a long way from saying that such a licensee has a right to an adjudicatory hearing when the Commission justifiably determines that a rule-making proceeding in which the licensee has participated has revealed that such a hearing would serve no useful purpose. See Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 210 F.2d 24 (1954).
 
 
 45
 Two decisions of the District of Columbia Circuit, on which the fulltimers strongly rely, also do not bear the weight that is placed upon them. Transcontinent Television Co. v. F.C.C., 113 U.S.App.D.C. 384, 308 F.2d 339 (1962), dealt with a 'rule-making' proceeding deciding whether one VHF television station (Channel 10) in Bakersfield, California should be deprived of its channel so that the city could be given two UHF channels. The Commission, however, did not attempt to modify Channel 10's license, making the new rule applicable only on its expiration. As the issue involved a particular situation, the Court, in dicta, properly stated that the rule-making proceeding would not have been sufficient if Channel 10's present license had been modified. The rule-making proceeding in Goodwill Stations v. F.C.C., 117 U.S.App.D.C. 64, 325 F.2d 637 (1963), was more general in scope. There, the Commission concluded that a second nighttime station should be assigned to each of 13 'Clear Channels,' but once again the agency singled out the 13 stations from their brothers on basis of an individualized study of their particular characteristics. Id. at 640. As the Commission refused to put its new rules into effect during the life of the fulltimers' licenses, the court was not obliged to rule on the question before us. We need not decide whether the Commission's course of action in Goodwill Stations was dictated by statute-- as the court's opinion assumes-- or prudence: it is enough to note the distance between that case and the instant one.[20]
 
 
 46
 While these considerations also meet the 316 claim of the daytimers and restricted fulltimers, an additional consideration bars them as well. The statute requires a hearing only when a station license is modified. But the licenses held by these petitioners only permit daytime broadcasting at local sunrise, not before. Indeed, in passing on their license applications on a case by case basis, the Commission never considered whether their presunrise operations were in the public interest. Nor did the Commission implicitly make such a finding by permitting these stations to operate under old rule 73.87. Music Broadcasting Co. v. F.C.C., 95 U.S.App.D.C. 12, 217 F.2d 339 (1964), delineates the limited compass of the rights granted by the rule. An ingenious daytimer argued that since the rule proscribed only that 'interference' which was 'undue,' the Commission was obliged to conduct an evidentiary hearing to determine that its service did not better promote the public interest than the service with which it interfered, before it could be terminated. Otherwise, it argued, the Commission could not be said to have found that it interfered 'unduly' with the signal of the dominant station. The Court rejected the argument and held that the rule did not grant the right to challenge the standards the Commission had developed in its administration. The daytimer was limited to a hearing on whether it caused objectionable interference, as the Commission had defined the term, and then only after the offending broadcasts had been summarily terminated. Here, the Commission has redefined by rule what interference was objectionable, basing its new definition on a broader view of the problem. Consequently, this group of petitioners has not been deprived of a 'right' the regulations generally granted, as was the case in KOA.
 
 
 47
 Both groups of petitioners next point to the proviso to 303(f) as establishing their right to an evidentiary hearing. The history of the statute suggests that this was not intended to accomplish any thing more than to secure the rights granted by 316 as it now stands. When the hearing proviso of 303(f) was added in 1934 as part of the general revision of the Radio Act of 1927, what is now 316 did not grant a station whose license was modified an evidentiary hearing in any case-- instead the Commission was only obliged to grant the aggrieved licensee a 'reasonable opportunity to show cause why such an order of modifification should not issue.' 312(b), 48 Stat. 1065, 1087, 73d Cong.2d Sess. (1934). As the legislative history indicates, Congress intended 303(f) to remedy this defect by vaguely mandating a 'public hearing' in certain limited areas.[21] Since what is new 316, added to the statute in 1952, 66 Stat. 717, is both more ample and more explicit, it would be paradoxical to construe the earlier 'public hearing' requirement as requiring an evidentiary hearing in cases where 316 does not.
 
 
 48
 We need not decide this, however, since both groups of petitioners fail on other grounds to qualify for whatever relief 303(f) affords. The fulltimers cannot bring themselves within the language of the proviso, since the FCC has not made any changes in their frequencies, authorized power or time of operation. They attempt to expand the statute beyond its language by arguing that if Congress required a hearing before a station's 'power' could be changed, it would be inconsistent to hold that it would not have required one before a station's 'effective power' was reduced by permitting additional interference. Whatever merit this argument would have standing alone, its force is undermined by the Supreme Court's construction of 316 in the KOA case, which accomplished just this result, within the limits we have marked. There is thus no compelling reason to expand 303(f) beyond its terms.
 
 
 49
 The complaining daytimers and restricted fulltimers are in a different position with regard to 303(f) as their 'power' and 'times of operation' have in fact been limited. But, as we have shown, this group of stations never had an unfettered right to operate at daytime power before sunrise. Since under the old rule these stations did not even have the right to demand an evidentiary hearing to challenge whether the limitations the Commission set upon their operation were in the public interest, we do not understand how 303(f) can be thought to protect them.
 
 
 50
 The fulltimers' final procedural challenge is that the provisions of the Rule, 73.99(c), whereby Presunrise Service Authorizations (PSA's) are to issue to eligible stations merely upon a showing of certain basic technical data, run counter to the scheme of 308 and 309 whereby, generally speaking, the FCC can grant or modify a license only upon a finding of public interest and-- most importantly-- after a lapse of 30 days following public notice of filing, during which period 'any party in interest' may file 'a petition to deny,' 309(d).[22] The Commission may dismiss such a petition without hearing if it finds 'on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and materal questions of fact' and that grant of the application would be in the public interest; otherwise it must set the application for a license or license modification for evidentiary hearing in the manner provided in 309(e).
 
 
 51
 The Commission thought that compliance with these procedures was unnecessary in the case of PSA's because of the exception in 309(c)(2)(A) relating to 'a minor change in the facilities of an authorized station.' We agree. Presunrise authorizations are accorded only to persons who have already obtained licenses under 309, in proceedings in which their general capacities and the effects of their operations were scrutinized, and the PSA's are less extensive as to time of operation than what many of these licensees had been permitted under rule 73.87. Equally important, the new rules take into account the interests of the only fulltimers for whom 309(d) guarantees have a real point. The regulations provide that a PSA 'is secondary to the basic instrument of authorization and may be suspended, modified, or withdrawn by the Commission without prior notice or right to hearing, if necessary to resolve interference conflicts, to implement agreements with foreign governments, or in other circumstances warranting such action,' 73.99(f). Consequently, in the rare case where a fulltimer can show that a PSA is producing results not contemplated by the present decision, for example, by depriving a large number of listeners of all AM radio service in the name of providing a smaller number of listeners with local service, relief is available. See also 47 C.F.R. 1.3. Cf. Permian Basin Area Rate Cases, supra, at 4343. In all other cases, compliance with 309(d) would be a useless formality anyway, since the present decision itself-- surely a matter the Commission 'may officially notice'-- would show that there were 'no substantial and material questions of fact' and that a grant of the application would be in the public interest, and no hearing would be required.
 
 
 52
 Alternatively we believe the analysis previously made with respect to 316 applies to 309 as well. Indeed, when the petition to deny is filed by a licensee, the 309(d) procedure is largely a method for effectively implementing 316 rights. The legislative history, see H.R. Rep. No. 1800, 86th Cong.2d Sess., 2 U.S.Code & Adm. News p. 3516, shows that 309(d) was an attempt to provide a workable method whereby persons affected by an individual application for a license or its modification were to have notice and a reasonable period for registering their objections without, however, requiring the FCC to hold a hearing in every case where a petition to deny was filed. Nothing in the text or in the history indicates that the statute was addressed to the entirely different situation where, after proceeding under 4 of the APA, the Commission utilizes the rule-making power granted by 303(r) to alter the permissible times of operation by existing licensees, particularly since, as indicated above, compliance with 309(d) after such a rule-making proceeding would generally be an exercise in futility.[23]
 
 
 53
 Complaints of Daytimers as to Refusals of Waivers
 
 
 54
 The last point requiring discussion is this: Certain daytimers, notably KXXX, a Class III station broadcasting daytime at 5000 watts power from Colby, Kansas and serving a wide rural area in four of the Plains States, protest the Commission's refusal to waive the application of the new rules so as to grant expanded presunrise privileges to those stations providing distinctive programming to rural areas which have few alternative services available. In addition to citing the administrative burden this would entail, the Commission justified its refusal both because it was reluctant to base its waiver decisions on its programming preferences, which it feared would be 'highly subjective * * * and of doubtful validity,' and because in the long run, decisions based on programming would be undermined by ownership changes, obliging the Commission repeatedly to review decisions made on subjective grounds in the first place. While in certain instances, the Commission may even have the duty to use programming criteria in its decision to grant or withhold a license, Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); see also 315; we appreciate the Commission's reluctance to enter the area where it is not compelled to do so; we can understand also why the Commission would be reluctant to grant waivers until there had been a reasonable opportunity to explore the working of its new Rule. Moreover, insofar as the daytimers are correct in their claim that the areas they serve are without alternative services, the Commission has taken a significant step to meet their complaint. For it has announced that power may be increased above 500 watts during the pre-dawn period beginning at 6 A.M., upon a showing that this will not interfere with the signal of any dominant co-channel station, based on the Commission's strict nighttime standards. Since these standards were also used in interference hearings held under old rule 73.87, Reese Broadcasting Corp., 20 R.R. 1136 (1960), the daytimers cannot fairly complain of their severity. The Commission has announced also that it will approach the Canadian authorities with a view to obtaining an agreement permitting presunrise operations from 6 A.M. local time, rather than 6 A.M. standard time, further improving the daytimers' position. The combined effect of these modifications will be to reduce the daytimers' complaint to the single fact of restriction against operation before 6 A.M. in the portions of the year when sunrise does not occur until later and when such operations could be conducted without breach of our international obligations or harmful effect on other stations. We shall expect the Commission, after a suitable trial period has passed, to approach such waiver applications in a manner consistent with its duties under the Act. Cf. Permian Basin Area Rate Cases, supra.
 
 
 55
 The petitions to review are denied.
 
 
 
 [1]
 Other channels are reserved for Class I-A and I-B stations in other nations of North America. See North American Regional Broadcasting Agreement, Appendix A, Tables I and II, 11 U.S.T. & I.O.A. 415, 446-47 (1960)
 
 
 [2]
 There are 926 Class II daytime or limited time American stations on Clear Channels, but 509 of them are assigned to Canadian, Mexican or Bahamian Class I-A frequencies and are beyond the scope of this proceeding
 
 
 [3]
 73.87. Program transmissions prior to local sunrise
 (a) The provisions of 73.6, 73.8, 73.9, 73.10, 73.23, 73.79, and 73.84 shall not prevent the transmission of programs between 4 o'clock a.m., local standard time, and local sunrise, of standard broadcast stations with their authorized daytime facilities: Provided, That the provisions of this section shall not extend to:
 (1) Stations regularly sharing time during daytime hours either under licenses pursuant to which time-sharing agreements have been entered into or licenses specifying hours of operation, unless time-sharing agreements have been reached covering such operation prior to local sunrise. Sections 73.74, 73.77, and 73.78 shall be applicable to such agreements.
 (2) Any Class II station which by use of its daytime facilities causes objectionable interference, as determined by the standard broadcast Technical Standards of this subpart or by the engineering standards of NARBA or the U.S./ Mexican Agreement (whichever is controlling) within the 0.5 mv/m 50 percent time skywave contour of any Class I station of the United States, Mexico, or any country party to NARBA, except (1) where the Class I station is located east of the Class II station, in which case operation may begin at local sunrise at the Class I station; (ii) where an agreement has been reached with the United States Class I station affected to begin operation prior to local sunrise.
 (3) Operation by use of its daytime facilities of any Class II station on any Class I-A channel not assigned to the United States under the North American Regional Broadcasting Agreement or under the U.S./Mexican Agreement.
 (4) Class IV stations authorized for operation with daytime power in excess of 250 watts.
 (b) Any station operating during such hours receiving notice from the Commission that undue interference is caused shall refrain from such operation during such hours pending further notice from the Commission.
 (c) Nothing contained in outstanding instruments of authorization for such stations shall prohibit such operation except as herein provided.
 
 
 [4]
 Daytime stations located in the same community as a fulltimer could become eligible upon a showing that they would not cause harmful interference over a substantial portion of another station's service area
 
 
 [5]
 Power was to be reduced below 500 watts insofar as this was required by our international obligations
 
 
 [6]
 Stations in this group are KMA, KAGO, WFHR, WNAM, WSAU, WCMB, KBOX, KQRS, WBEL, KBEA, KQV, KXYZ, KABC
 
 
 [7]
 Stations in this group are KXXX, KGDN, WHUT, and KMMJ
 
 
 [8]
 Rockland Broadcasters; Ubiquitous Corporation; Christian Broadcasting Corporation; 5 KW, Inc.; Heart of Georgia Broadcasters, Inc.; Three Towers, Inc.; Bexar Broadcasting Co., Inc
 
 
 [9]
 Sixty-five have one or more additional fulltime stations in Class III or higher; fourteen have another fulltime Class IV station; and nine are in urbanized areas containing many fulltime stations
 
 
 [10]
 Of the 135 communities represented by the daytime stations filing comments, fifty-three have FM stations. Twenty-two, however, are not assigned an FM frequency in the Commission's Allocation Table. Other communities also have no assignment, but since they are in urbanized areas, 'channels might be available under the '25 mile rule' (permitting the shift of a frequency assignment from a community within 25 miles already receiving such service), or possibly additional assignments might be available through rule making; but a substantial number of these situations are in areas where channels are scarce and the making of additional assignments is not always possible however desirable it might be.'
 On the other hand, more than half of the fulltime Class III stations filing have associated FM facilities and another 17 could take advantage of unoccupied channels.
 
 
 [11]
 Such a finding was made, however, in the Commission's 1958 decision. 17 R.R. at 1962
 
 
 [12]
 The losses on regional channels may be tabulated as follows:
 Station Service Loss
 WREC 367,000
 WKY 303,000
 WRC 191,000
 WWDC 139,000
 WMAK 54,000
 WISH 300,000
 WAMP 885,000
 WRBL 25,000
 ---------
 Total 2,264,000
 
 
 [13]
 '(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;'
 
 
 [14]
 '(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;'
 
 
 [15]
 '(b) In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.'
 
 
 [16]
 The relevant parts of the Agreement read:
 'Pursuant to Section A, Subsection 6, of Annex 2 of the North American Regional Broadcasting Agreement, (1) the Governments of the United States of America and Canada agree to permit, bilaterally, certain AM broadcasting stations to operate for a limited period of time prior to local sunrise, at least during the winter months, using all or part of their authorized daytime facilities in accordance with the criteria as set forth below:
 'Program transmission by standard broadcast stations with authorized daytime facilities from 6:00 a.m. local standard time to local sunrise (presunrise operation) will be permitted subject to the following provisions:
 'The privilege of pre-sunrise operation would not extend to:
 (1) Class I stations.
 (2) Class II stations operating on Clear Channels on which the other country had a Class I-A priority.
 (3) Class IV stations operating on Local Channels authorized for operation with daytime power in excess of 250 watts.
 'Class II stations other than as noted in (2) above to be permitted pre-sunrise operation in relation to other Class II stations in accordance with the provisions for Class III stations, where such stations:
 (1) afford NARBA night time protection to the 0.5 mv/m 50 per cent skywave contour of any co-channel Class I-B station in the other country, or
 (2) are located west of the co-channel Class I-B station(s) in the other country and begin no earlier than sunrise at the location of the western-most Class I-B station located east of the Class II station.'
 'Proposed pre-sunrise operations may be presumed to be acceptable if they are within the provisions set out in this understanding. However, each proposal shall be notified directly between the Federal Communications Commission of the United States and the Department of Transport of Canada and within sixty days of receipt of a proposal the recipient agency may object thereto. The notification shall include the exact operating characteristics of each station permitted to operate with authorized (or reduced) daytime facilities during pre-sunrise hours.'
 
 
 [17]
 KGDN also states it relied on the Further Notice's promise that daytimers, otherwise ineligible because located in an urbanized area containing a fulltimer, would be entitled to operate presunrise upon a showing of unusual circumstances and argues that if this promise had been kept, it would have been eligible because of its distinctive religious programming. But it was only by misreading the Notice that King's Garden could have been mislead. The Notice did not promise that daytimers, on any showing, could begin before 6 A.M
 
 
 [18]
 '(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.'
 
 
 [19]
 'Sec. 316. (a) Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this Act or of any treaty ratified by the United States will be more fully complied with. No such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall have been given reasonable opportunity, in no event less than thirty days, to show cause by public hearing, if requested, why such order of modification should not issue: Provided, That where safety of life or property is involved, the Commission may by order provide for a shorter period of notice
 (b) In any case where a hearing is conducted pursuant to the provisions of this section, both the burden of proceeding with the introduction of evidence and the burden of proof shall be upon the Commission.'
 
 
 [20]
 Zenith Radio Corp. v. F.C.C., 93 U.S.App.D.C. 284, 211 F.2d 629 (1954), also cited by petitioners, is not in point. There, the appellant's right to an evidentiary hearing was conceded, and the Court simply decided that failure to participate in a more general rule-making proceeding did not constitute a waiver
 
 
 [21]
 The hearing proviso to 303(f) was part of a bill that first passed the 72d Congress, only to be vetoed by President Hoover. It was proposed because 'no hearing is required by existing law.' S.Rep. 1045, 72d Cong., 2d Sess. 9 (1933)
 
 
 [22]
 '(d) (1) Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit
 '(2) If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a), it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a), it shall proceed as provided in subsection (e).'
 
 
 [23]
 Interstate Broadcasting Co. v. F.C.C., 116 U.S.App.D.C. 327, 323 F.2d 797 (1963), is not to the contrary. The applications were clearly within 309 and the rule relied on by the FCC to prevent WQXR's presentation of evidence had been framed merely on technical criteria