GENERAL TELEPHONE COMPANY OF the SOUTHWEST et al., Petitioners,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

National Cable Television Association, Inc., et al., Intervenors.

No. 29246.

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1971.

---

4. See discussion by Texas Supreme Court Justice Joe Greenhill, 31 Tex.Bar Journal 1036, at page 1066.

William Malone, Washington, D. C., William R. Brown, Houston, Tex., Irwin Schneiderman, Raymond L. Falls, Jr., New York City, for Continental Telephone System.

Ward W. Wueste, Jr., Hubert M. Preston, San Angelo, Tex., Theodore F. Brophy, New York City, for General Telephone System.

M. Truman Woodward, Jr., New Orleans, La., Thomas J. O'Reilly, Washington, D. C., for U. S. Telephone Assn.

Gary L. Christensen, Charles S. Walsh, Washington, D. C., for National Cable Television Assn., Inc.

William I. Aitken, Bert L. Overcash, Richard W. Smith, Gilbert G. Lundstrom, Lincoln, Neb., for T-V Transmission, Inc. and Lincoln Telephone and Telegraph Co.

Arthur Stambler, Washington, D. C., Harold Farrow, Oakland, Cal., for Cal. Community Television Assn.

Michael L. Tomaino, Rochester, N. Y., for Rochester Telephone Corp.

James L. White, Denver, Colo., for United Telephone Co. of Kan., Inc.

Hayward D. Fisk, Merriam, Kan., Harry B. Kelleher, New Orleans, La., for United Telephone System Companies.

Lloyd D. Young, Washington, D. C., for United Utilities, Inc. and United Telephone System.

John N. Mitchell, U. S. Atty. Gen., Erwin N. Griswold, Sol. Gen., U. S. Dept. of Justice, Harry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Stuart F. Feldstein, Atty., F.C.C., Howard E. Shapiro, Chief, Appellate Section, Seymour H. Dussman, Atty., Dept. of Justice, Washington, D. C., for respondents.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

TUTTLE, Circuit Judge:

This case involves consolidated petitions to review certain orders of the Federal Communications Commission. The disputed rules prohibit telephone companies (hereafter carriers) from furnishing CATV service in their telephone service areas, either directly or through affiliates, and disallows construction by them of cable facilities for independent CATV operators unless the carrier first offers to such operators the option of placing their own cables on the carriers' poles. We affirm the Commission's orders.

BACKGROUND

A community antenna television system (CATV) is a facility which receives television and FM radio signals by means of high antennas or by microwave transmission, amplifies them, and distributes them by coaxial cable to the premises of its subscribers who pay a fee for the service. There are three essential components to the system:

1. Reception facilities which extract the broadcast signal from the air or microwave transmission;

2. the head-end (in-put) equipment which converts and amplifies the signals thus received; and

3. the distribution system which consists of feeder or trunk lines originating at the head-end, smaller distribution cables which carry the signal to the immediate vicinity of the subscriber, and

the drop wires which carry the signal from the distribution cable into the subscriber's home. Distribution is accomplished either over circuits constructed by and leased from common carriers, such as telephone companies, by the CATV operator (channel service) or by the CATV operator's stringing its own cables from utilitiy poles or through utilities' ducts (pole attachment). A third and generally unfeasible method is for the CATV operator to construct his own system in its entirety.

As the common carriers began to assume a larger role in the explosive growth of the CATV business, new and complex regulatory problems arose. Starting in 1966 the Commission began affirmatively to assert its control over telephone company practices with respect to CATV systems. Several complaints were filed by CATV interests alleging, inter alia, that the carriers favored their subsidiary CATV companies over the independents in a variety of ways and that independents were often required to lease channel service rather than being permitted to rent pole space. Subsequently the Commission determined that the provision of channel service by telephone companies for CATV required certification under Section 214 of the Communications Act. The granting of a certificate was to be predicated on several factors including the degree of affiliation between the telephone carrier and the CATV operator. The Commission was of the opinion that by reason of their control over utility poles or conduits, the telephone companies were in a position to preclude or substantially delay an unaffiliated CATV system from commencing service and thereby eliminate competition. General Telephone Company of California, 13 FCC 2d 448 (1968). The Commission was upheld on

appeal in General Telephone Company of California v. FCC, 134 U.S.App.D.C. 116, 413 F.2d 390 (1969), cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163.

## THE PRESENT PROCEEDING

Thereafter several telephone companies, including petitioners here, filed applications for certification under Section 214. All proposed to serve CATV systems with which they were affiliated in some manner, thus raising directly the problem of the anticompetitive potential of a telephone company-CATV system affiliation. The Commission decided to deal with this and related issues through rule-making and in April, 1969 it issued a Notice of Inquiry and Notice of Proposed Rulemaking in Docket No. 18,509. Foremost among the issues to be considered was whether telephone companies should be permitted to engage in furnishing CATV service to the public at all, either directly or through affiliates, and, if so, what conditions should be imposed on Section 214 certification. The Commission, upon review of the various comments filed in response to the Notice, identified the central problem as being the anomalous competitive situation between affiliated CATV systems and those which are not affiliated, but which have to rely on the telephone companies for either construction and lease of channel facilities or for the use of poles for the construction of their own facilities. Additionally the Commission felt that if this made likely the telephone companies' preemption of CATV service in a community the effect would be to extend, without justification, the companies' monopoly position to broadband cable services.[1] To rectify this situation the Commission promulgated the rules here in dispute. With explanatory provisions

---

1. The broadband cable is composed of numerous channels or communications paths of varying frequencies capable of transmitting electrical communications. Because of the wide range of frequencies available for data transmission, a single cable can carry a variety of signals for different uses. Among the present uses of broadband cable are CATV transmissions, reproduction of documents and photographs, telegraph, telephoto, remote metering, and the like. See American Trucking Associations, Inc. v. FCC, 126 U.S.App.D.C. 236, 377 F.2d 121 (1966).

not here relevant omitted, the rules are as follows:

Section 74.1101 of the Rules and Regulations of the FCC:

## Definitions

(a) Community antenna television system. The term "community antenna television system" ("CATV system") means any facility which, in whole or in part, receives directly or indirectly over the air and amplifies or otherwise modifies the signals transmitting programs broadcast by one or more television stations and distributes such signals by wire or cable to subscribing members of the public who pay for such service.

Sections 63.54–63.57 of the Rules and Regulations of the FCC, effective May 1, 1970:

Section 63.54. Applications by telephone common carriers for authority to construct or operate distribution facilities for channel service to community antenna television (CATV) systems in their service areas shall include a showing that applicant is unrelated and unaffiliated, directly or indirectly, with the proposed CATV customer or customers. Applications which do not contain the showing required by this section will be returned as unacceptable for filing, subject to the provisions of § 63.56.

Section 63.55 Waivers.

(a) In those communities where CATV service demonstrably could not exist except through a CATV system related to or affiliated with the local telephone common carrier or upon other showing of good cause, the provisions of § 63.54 may be waived, on the Commission's own motion or on petition for waiver, if the Commission finds that public interest, convenience and necessity would be served thereby.

Section 63.56. Temporary authorizations under Section 214(a) during period allowed for discontinuance of CATV service by telephone common carriers directly or through affiliates.

All telephone common carriers are required to discontinue providing CATV service directly or through their telephone service areas within 4 years from March 16, 1970; *Provided, however,* that during the said 4 year period temporary authorizations may be granted under Section 214(a) of the Act, to cover existing telephone common carrier CATV channel services furnished to an affiliated or related CATV system.

Section 63.57 Availability of pole (conduit) rights to CATV customer.

Applications by telephone common carriers for authority to construct or operate distribution facilities for channel service to CATV systems shall include a showing (in addition to the conditions set forth in the above sections) that the independent CATV system proposed to be served, had available, at its option, and within the limitations of technical feasibility, pole attachment rights (or conduit space, as the case may be), at reasonable charges and without undue restrictions on the uses that may be made of the channel by the customer. The availability must exist not only at the time of the authorization but also prior to the customer's decision to seek an award of a local franchise, if such is required, and that such policy of the applicant is made known to the local franchising authority. Separate documents, attesting the above conditions, by the CATV customer and, where applicable, by the appropriate local franchising authority, must be annexed to the application.

Section 64.601. Furnishing of facilities for CATV service to the viewing public.

(a) No telephone common carrier subject in whole or in part to the Communications Act of 1934, as amended, shall directly or indirectly through an affiliate owned or controlled by or under common control with said telephone communications common carrier, engage in the furnishing of CATV service to the viewing public in its telephone service area.

Section 64.602 provides for waiver of Section 64.601 in terms identical to Sec-

tion 63.55. The full text of the rules can be found at 47 CFR 63.54–63.57 and 64.601–64.602.

## ISSUES

The following issues are raised on this appeal:

(1) Whether the Commission had statutory authority to adopt these rules and whether it properly relied on antitrust concepts as a basis for its orders;

(2) Whether the rules deprive the telephone companies of rights in violation of the Constitution; and

(3) Whether the Commissioner's rules lack an adequate basis in fact or are otherwise arbitrary, capricious, and an abuse of discretion.

We consider each of these issues, *infra*.

## I. STATUTORY AUTHORITY

■ At the outset petitioners contend that the Commission is without statutory authority to issue the rules here in question. They argue that the order goes beyond any specific grant of authority in the Communications Act of 1934 and must therefore be invalidated. We reject this argument.

The jurisdictional questions raised here are not altogether new; the explosive growth of CATV has understandably caused the Commission a great deal of concern, and it has undertaken, little by little, to assert its control over the industry. In the past, where similar, if not identical, objections to the Commis-

sion's authority over CATV systems have been advanced, the courts have held for the Commission.[2]

■ The Communications Act was designed to endow the Commission with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications. In FCC v. Pottsville Broadcasting Co. the Supreme Court said that "(u)nderlying the whole (Communications Act) is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). Congress, in 1934, could hardly have foreseen the radical innovations in communications technology which have arisen in recent years and it is for this reason that the Act must be read as granting the Commission "a comprehensive mandate," with "not niggardly but expansive powers." National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

The Supreme Court has recently had occasion to review the Commission's status vis a vis CATV[3] and has concluded that Section 2(a) of the Communications Act[4] alone is sufficient to support the Commission's assertion of jurisdiction over CATV systems. In response to the contention that CATV systems fall beyond the Commission's regulatory ambit since they are neither common car-

2. E. g., United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) ; Buckeye Cablevision Co. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967) ; Black Hills Video Corp. v. FCC, 399 F.2d 65 (C.A.8, 1968) ; but cf. Midwest Video Corp. v. United States (FCC), 441 F.2d 1322 (C.A.8 May 13, 1971) where an order of the Commission requiring CATV systems serving more than 3500 subscribers to originate programing was set aside on the grounds that such a regulation would force CATV operators into an entirely different business from that in which they are now engaged. However, we note that the rejec-

tion of such potentially confiscatory rules is not tantamount to a denial of the power to regulate.

3. United States v. Southwestern Cable Co., supra.

4. (47 U.S.C. § 152(a) "The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication * * * ")

riers within the meaning of Title II of the Act nor broadcasters within Title III, the Court said,

"Nothing in the language of § 152(a), in the surrounding language, or in the Act's history or purposes limits the Commission's authority to those activities and forms of communication that are specifically described by the Act's other provisions. The section itself states merely that the 'provisions of (the Act) shall apply to all interstate and foreign communication by wire or radio * * *.' Similarly, the legislative history indicates that the Commission was given 'regulatory power over all forms of electrical communication * * *.'" United States v. Southwestern Cable Co., supra, 392 U.S. at 172, 88 S.Ct. at 2002.

Although the holding expressly limited the Commission's authority under § 2(a) to that "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting," the Court declined to rule on what powers, if any, the Commission would have with respect to CATV under other circumstances. Id. at 178, 88 S.Ct. at 2005.

We need not here decide the full scope of the Commission's authority over CATV under § 2(a) since we are of the opinion that that section together with Secton 1 (47 U.S.C. Sec. 151) and Section 214 provide ample jurisdiction for the Commission's orders. Section 214 provides in pertinent part that "no carrier shall undertake the construction of a new line * * * or shall acquire or operate any line * * * unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line." A "line" is defined as "any channel of communication established by the use of appropriate equipment." Additionally the Commission is empowered to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." This specific authorization with respect to Section 214 certification is supplemented by Section 4(i) of the Act (47 U.S.C. § 154(i)) which permits the agency to "make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."

That a common carrier must obtain a Section 214 certificate of "public convenience and necessity" in order to provide channel service to an independent CATV operator is not here questioned. General Telephone Co. of California v. FCC, supra. We have no doubt that the same requirement must apply where a common carrier proposes to construct or operate CATV channel service for its own commercial use. However, the petitioners would have us hold that where an affiliate of a common carrier proposes to operate such a facility, certification cannot be required since § 214 applies only to carriers, and CATV companies, affiliated or otherwise, are not carriers. Although this reasoning is persuasive, we cannot agree.

As noted above the Supreme Court has held that even though CATV systems are neither common carriers nor broadcasters, they do not, by that fact alone, fall beyond the purview of the Act. While the Commission is specifically charged with the regulation of common carriers under Title II and broadcasters under Title III, it nonetheless has the additional and overriding responsibility, as enunciated in Section 1 (47 U.S.C. § 151), to "make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities at reasonable charges * * *." The development of CATV services is a part of this broader purpose. The Commission is obliged to discharge its responsibilities in this area as best it can and it has chosen in this instance to implement the national policy by limiting the in-

volvement of common carriers, over which the Commission has unquestioned jurisdiction, in CATV operations.

 Under these circumstances the activities of the non-common carrier affiliates may be imputed to the common carrier parent. To hold otherwise would balk the Commission in the execution of its statutory duties. The anticompetitive practices, real and potential, which the Commission sought to eradicate through its rules are effected through the instrumentality of an affiliated CATV company. Where the statutory purpose could thus be easily frustrated through the use of separate corporate entities, the Commission is entitled to look through corporate form and treat the separate entities as one and the same for purposes of regulation. Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950); see Schenley Distillers Corp. v. United States, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946); Kavanaugh v. Ford Motor Co., 353 F.2d 710 (C.A. 7, 1965). The Commission has concluded that the ends it sought could not be achieved without drawing carrier affiliates under the aegis of Section 214 and this we find is permissible.

 Several of the telephone companies argue that since they are "connecting carriers" within the meaning of § 2(b) (2) of the Act [47 U.S.C. § 152 (b) (2)], they cannot be made subject to the requirements of § 214. Section 2(b) (2) provides that the Commission has no jurisdiction with respect to "any carrier engaged in interstate or foreign communication *solely* through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier." (emphasis supplied). This argument was considered and rejected by the D.C. Circuit Court of Appeals in General Telephone Co. of California v. FCC, supra. We agree with the reasoning of our sister circuit which was, inter alia, that "(t)he exclusion embodied in Section 2(b) (2) was meant to protect State jurisdiction over local telephone facilities which could place interstate calls through their connection with major toll lines; this interstate facet of the company's operation was incidental to its primary local service," 413 F.2d at 402. Certainly CATV systems are engaged in interstate communication even where "the intercepted signals emanate from stations located within the same State in which the CATV system operates," United States v. Southwestern Cable Co., supra, 392 U.S. at 168–169, 88 S.Ct. at 2000, and it cannot be said that the furnishing of CATV services is incidental to the function of providing local telephone service. Since such interstate communication is not solely "through physical connection with the facilities of another carrier," the exemption is lost, although only as to CATV channel service and not as to other interstate activities which fall within the legitimate intendment of Section 2(b) (2). We note, in addition, that the reach of Section 214 is not limited to common carriers, referring as it does simply to "carriers" and thus by necessary implication a "connecting carrier" may be subject to the certification requirements of that section if an exemption is not otherwise available.[5]

5. Petitioner Rochester Telephone Corp. (Rochester) argues that it should be exempt under Section 2(b) (1), [47 U.S.C. § 152(b) (1)] which pertains to "charges, classifications, practices, services, facilities, or regulations for or in connection with *intrastate* communication service by wire or radio of any carrier." (Emphasis supplied). In view of the Supreme Court's holding that CATV systems are engaged in *interstate* communication, we cannot agree. Nor as Intervenor Lincoln Telephone and Telegraph Company (Lincoln) suggests does Section 221(b) apply. That section exempts from Commission regulation facilities "for or in connection with * * * telephone exchange service" which is·defined in Section 3(r) of the Act [47 U.S.C. § 153(r)] as: "service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily fur-

Having ascertained that the construction and/or operation of channel services for CATV systems by carriers or their affiliates requires prior certification by the Commission under Section 214, we turn now to the question of whether the Commission has improperly utilized antitrust standards in promulgating these rules. We hold that it has not.

Initially it is urged that the public convenience and necessity standard of Section 214 must be interpreted in the same manner as Section 1(18) of the Interstate Commerce Act from which the language of Section 214 was drawn. While the similarities between the two sections are unquestionable, it must be emphasized that the functions of the Interstate Commerce Commission, as outlined in the National Transportation Policy (49 U.S.C. Sec. 1), are of an entirely different nature than those of the Federal Communications Commission. The former is required to weigh variables which are foreign to the mandates of the Communications Act.[6]

In view of the differing demands placed upon the two agencies the question of public injury in the communications field need not and, in some instances cannot, be approached in the same manner as the question of injury in the transportation field. Carter Mountain Transmission Corp. v. FCC, 116 U.S.App.D.C. 93, 321 F.2d 359 (1963). Thus we are unwilling to restrict the Federal Communications Commission to a course of action which has been dictated by the requirements of the transportation industry.

A second objection is that the Commission's reliance solely on antitrust considerations in formulating these rules is beyond the ken of its authority. We disagree.

A review of the record in this case reveals that in initiating its inquiry into telephone company affiliations with CATV systems the Commission was concerned not only with the anticompetitive implications of such affiliation, but with a variety of other factors as well.[7] However, these other factors did not have controlling weight in the ultimate decision. The Commission noted that "in view of our conclusions restricting telephone company-CATV affiliations in the service areas of the telephone companies, the cause for concern over potential discriminatory practices (against regular telephone service subscribers) will be considerably decreased." Final Report and Order in Docket No. 18,509 (A. 647). It is clear that the Commission did take into account factors other than antitrust issues, although it found that the latter were of such overwhelming importance that rules could be predicated on that basis alone.

Briefly stated, the agency's response to the problem confronting it was as follows: Since the telephone companies have a natural monopoly over the means required to conduct a CATV operation, i. e., the poles or conduits, they are in a position to pre-empt the market for this important service. CATV service is the initial practical application of broadband cable technology; whether broadband cable services should evolve in a common carrier mode or some other structure is

nished by a single exchange, and which is covered by the exchange service charge." Clearly CATV channel distribution does not fit within that definition.

6. For instance the Commerce Commission has the difficult task of balancing one form of transportation against another in order to "preserve the inherent advantages" of each and "to foster sound economic conditions in transportation"; additionally it is charged with responsibility for safety in the industry, fair wages and working conditions, and cooperation

with state regulatory agencies. None of these requirements appears in the Communications Act.

7. For instance the Commission inquired into such diverse matters as the possibility and ramifications of common carriers acting as program originators, the effects of CATV affiliation upon regular telephone service consumers, the role of state and local authorities in CATV franchising, and the incentives for independent CATV operators to operate also as common carriers.

an issue more properly reserved for future consideration. However, at present CATV is one important gateway to entering the broadband market and it is the Commission's obligation to eliminate any arbitrary blockage of this gateway There is no reason to deny independent operators the opportunity to participate in broadband cable development, yet without adequate regulation the power to deny entry would reside in the telephone companies. Thus, in order to prevent unnecessary concentration of communications media, these rules were promulgated. Final Report and Order in Docket No. 18509 (A. 619).

We note that the Commission's approach is based on its own expert analysis of the needs of the broadband cable market. Although it does not yet know how broadband cable services will or should develop, it is unwilling at this point to allow the telephone companies to pre-empt the field simply by virtue of their control over means. It is settled that "practices which present realistic dangers of competitive restraint are a proper consideration for the Commission in determining the 'public interest, convenience, and necessity,' (Citations omitted)" and the elimination of this danger is consistent with the Commission's broad duties under the Communications Act. Metropolitan Television Co. v. F.C.C., 110 U.S.App.D.C. 133, 289 F.2d 874, 876 (1961).

This approach, as embodied in the rules before us, is fully in conformity with the standard enunciated in FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), a case strongly relied upon by petitioners. In reversing the Commission for authorizing the duplication of radiotelegraph facilities in a certain market the Court said, "Had the Commission clearly indicated that it relied on its own evaluation of the needs of the industry rather than on what it deemed a national policy, its order would have a different foundation. There can be no doubt that competition is a relevant factor in weighing the public interest. Cf. McLean Trucking Co.

v. United States, 321 U.S. 67, 86–88 [64 S.Ct. 370, 380–381, 88 L.Ed. 544]. Our difficulty arises from the fact that while the Commission recites that competition may have beneficial effects, it does so in an abstract, sterile way. Its opinion relies in this case not on its independent conclusion, from the impact upon it of the trends and needs of this industry, that competition is desirable but primarily on its reading of national policy * * * " Id. at 94–95, 73 S.Ct. at 1004.

The case stands for the proposition that competition is not always in the public interest, as evidenced by the various regulated industries such as public utilities where competition would indeed be potentially harmful. However, that competition may be in the public interest is clear. National Broadcasting Co. v. United States, supra; United States v. Radio Corporation of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Mansfield Journal Co. v. FCC, supra. In United States v. Radio Corporation of America, supra, the court noted that " * * * in a given case the Commission might find that antitrust considerations alone would keep the statutory standard from being met, as when the publisher of the sole newspaper in an area applies for a license for the only available radio and television facilities, which, if granted, would give him a monopoly of that area's major media of mass communication. (citation omitted)" at 351–352, 79 S.Ct. at 467–468.

It is true that the Commission does not know or even pretend to know what the future of broadband cable will be. However, we do not feel that the Commission should thereby be estopped to respond to the obvious problems posed by telephone company affiliation with CATV operations. Clearly the development of CATV services is a legitimate concern for the Commission. United States v. Southwestern Cable Co., supra. Here it has determined that the public convenience and necessity would best be served by keeping the gateway to broadband cable open. This is a conclu-

sion based "on the Commission's own judgment" not on "the unjustified assumption that it was Congress' judgment" that competition in the broadband cable market must be fostered. FCC v. RCA Communications, Inc., supra, 346 U.S. at 96, 73 S.Ct. at 1005.

 We feel that the "public convenience and necessity" standard of Section 214 is sufficiently broad to permit the Commission to issue these rules. That standard is to be construed so as to secure for the public the broad aims of the Communications Act. Western Union Division, etc. v. United States, 87 F.Supp. 324 (USDC, D.C., 1949), affd. 338 U.S. 864, 70 S.Ct. 148, 94 L.Ed. 530. And those aims, as set out in Section 1 of the Act (47 U.S.C. § 151) are to make available to all the people of the United States a rapid, efficient Nation-wide and world-wide wire and radio communication service. It is this purpose which the Commission here seeks to implement.

 Additionally we note that not only is the Commission permitted to consider the anticompetitive potential of activities which fall within the purview of its jurisdiction, but that in some instances it is obliged to consider them. McLean Trucking Co. v. United States, supra; Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968). That antitrust factors may be the sole basis for an agency decision is adequately attested to by the decision in Mansfield Journal Co. v. FCC, supra. Thus we are of the opinion that the Commission's orders do not exceed the bounds of the agency's statutory responsibilities.

However, it is argued that the areas in which the Commission may enforce the antitrust laws are circumscribed by statute and that the agency is not here acting pursuant to such specific authority.[8] We note that the specific provisions alluded to are in addition to and distinct from the Commission's general obligations under the Act to ensure the public convenience and necessity. Here the Commission has not directed its attention to findings of substantive violations of antitrust law, but rather considers anticompetitive potential in the context of its overriding responsibility to satisfy the public interest.

 Petitioners urge that, notwithstanding the above, the Commission's rules are unsupported by concrete factual data demonstrating the beneficial effects of the rules, and that, in fact, the rules would stifle rather than enhance competition. We do not here consider the sufficiency of the Commission's findings in detail. See, infra. It is enough to note that "(t)he Commission is not required to make specific findings of tangible benefit. It is not required to grant authorizations only if there is a demonstration of facts indicating immediate benefit to the public. * * * In the nature of things, the possible benefits of competition do not lend themselves to detailed forecast, cf. [National] Labor [Relations] Board v. Seven-Up Co., 344 U.S. 344, 348, [73 S.Ct. 287, 289, 97 L.Ed. 377] but the Commission must at least warrant, as it were, that competition would serve some beneficial purpose * * *" FCC v. RCA Communications, Inc., supra, 346 U.S. at 96–97, 73 S.Ct at 1005. We are satisfied that the Commission has met that standard here.

 As to the question of whether or not the proposed rules would enhance competition in the broadband cable market, we intimate no views. It is well-established law that it is not for the court to decide the wisdom of an agency's policies. If the rules prove to be unworkable or have an adverse effect on competition in the CATV industry the Commission can be expected to revise them in order to meet the exigencies of the competitive situation.

8. Petitioners point to Section 7 of the Clayton Act (15 U.S.C. Sec. 18) and Sections 212, 215 and 314 of the Communications Act.

## II. CONSTITUTIONAL ISSUES

■ (1) Section 64.601 directly and Section 63.54 indirectly bar the telephone companies and their affiliates from engaging in CATV operations in the carriers' service areas. To this extent, it is argued, the rules deprive them of their lawful right to engage in the CATV business.[9] The issue here is whether the rules comport with the requirements of substantive due process. It is, of course, clear that the courts are without power to substitute their judgment for that of the legislative (or administrative) body whose responsibility it is, in the first instance, to decide policy questions. The wisdom or expediency of a given law or regulation is not open to question in the courts. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1933); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1936); Daniel v. Family Security Life Insurance Co., 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632 (1949). The judicial function is at an end once it has determined that the regulation in issue is reasonable and not arbitrary.

■ It is argued here that the rules bear no reasonable relation to the evil sought to be remedied. Chief reliance by the petitioners is put on Louis K. Liggett Co. v. Baldridge, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928), in which a state statute prohibiting ownership of drug stores by persons other than licensed pharmacists was struck down on the grounds that the relation between ownership and the public health was strictly conjectural. Ownership takes on a completely different aspect in the case before us. The public interest factor here revolves around antitrust concepts and we are obliged to recognize that antitrust law and ownership are prima facie related. The claim that ownership by a regulated monopoly of a business (CATV) which lends itself readily to extending that monopoly has no real relationship to the tenets of antitrust law cannot be supported. We find that there is a rational relation, particularly in view of the telephone company's monopoly over the requisite means of CATV operation, and thus we are unprepared to say that the Commission has acted unreasonably or arbitrarily.

■ Petitioners rely additionally on the rationale of Stahlman v. FCC, 75 U.S.App.D.C. 176, 126 F.2d 124 (1942) in which it was held that the Commission is without power to bar newspaper interests from owning radio stations. However, it has been held in several cases that broadcast licenses may be denied where the applicant newspaper enjoys a communications monopoly in the area which it wants to serve by radio. McClatchy Broadcasting Co. v. FCC, 99 U.S.App.D.C. 195, 239 F.2d 15 (1956); Mansfield Journal Co. v. FCC, supra. Moreover, the Commissions' position is even stronger where as here it is dealing with common carriers. The differential treatment "accorded to communications common carriers and radio broadcasters in the Communications Act reflects Congress' belief that commercial broadcasting is not a natural monopoly which creates the same kinds of risks that a telephone system does." National Association of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 420 F.2d 194, 203 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102. The Commission discerned an existing

---

9. Intervenor Lincoln asserts that the Commission cannot regulate or prohibit a common carrier's entry into a noncarrier business, i. e., CATV. It is true, as Lincoln suggests, that CATV is not a common carrier service. Philadelphia Television Broadcasting Co. v. FCC, 123 U.S. App.D.C. 298, 359 F.2d 282 (1966). However, the reach of Section 214 is not confined to certification of common carrier facilities. The section provides that "no carrier" shall construct "a new line" without prior certification, "line" being defined as "any channel of communication established by the use of appropriate equipment." The construction of CATV channel facilities is the building of a "line" to be used in interstate communications, and therefore, it is subject to Section 214 certification, even though CATV is not a common carrier service.

realistic danger of competitive restraint and in its rule-making capacity it took steps to eliminate such anticompetitive potential. It did not bar the telephone companies from the CATV business altogether for the prohibition extends only to the telephone companies' service areas. Outside these areas the companies are free to compete with independent operators. In view of the carriers' natural monopoly power in their service areas, we do not think the rules are arbitrary or unreasonable.

(2) Section 63.57 of the new rules provides that certificates under Section 214 for CATV channel service facilities will not be granted unless the applicant first offers the CATV operator space on its telephone poles or conduits for the operator's private purposes. This, it is argued, deprives the telephone companies of space on their poles without due process of law.[10] Again we do not agree.

Initially it ought to be emphasized that the rules are limited in their application to the construction and operation of facilities for use by CATV systems. Although the Commission expressed its concern for the development of the entire broadband spectrum, it specifically limited the application of its rules to one facet of broadband cable usage, CATV.[11]

Thus the telephone companies would appear to be free to construct and operate broadband cable facilities for non-CATV uses without prior certification under Section 214. (Whether certification might otherwise be required is not here relevant.) The companies are, of course, prohibited from providing CATV service, either directly or indirectly through affiliates, in their service areas, but this we have determined is a reasonable regulation designed to effectuate the national communications policy. The rules themselves do not require the telephone companies to furnish CATV facilities to independent operators. In fact under the rules they are free *not* to provide such service.

Under these circumstances the pole space requirement is not a deprivation of property since the companies need be engaged in furnishing facilities for CATV only on a volitional basis. Viewed in that light the pole space requirement is simply a condition to entry into the CATV business. We do not think it unreasonable. Cf. United States v. Baltimore and Ohio Railroad Co., 333 U.S. 169, 68 S.Ct. 494, 92 L.Ed. 618 (1948).

There is a further aspect to this issue which requires comment. The Government in its brief suggests that the pole space requirement is dictated by the ra-

---

10. Alternatively, Intervenor Lincoln asserts that the pole space requirement forces it to supply a competitor with the means of competition. This is simply a different perspective on the issue raised by petitioners. Both advance the proposition that the pole space rule unlawfully requires the telephone companies to surrender their private property to someone else, i. e., independent CATV operators. The same analysis, therefore, suffices for both.

11. Careful analysis of the rules, confirms that this is so:
1) The definition of CATV is confined to facilities which transmit programs broadcast by one or more television stations. (Sec. 74.1101)
2) Section 63.54 deals with applications by telephone companies for authority "to construct or operate distribution facilities for channel service *to CATV*

*systems* in their service areas." The key words here are "to CATV systems". That phrase modifies the meaning of the preceding words and clearly indicates that the rule applies only to facilities intended to serve CATV purposes.

3) Section 63.57 is couched in terms substantially identical to those of Section 63.54. Additionally this rule avers to "the independent CATV system proposed to be served * * *." Thus if the telephone company does not propose to operate a CATV system itself (or through an affiliate) or to serve an independent CATV operator the rule has no application.

4) Section 64.601 prohibits the "furnishing *of CATV service* to the viewing public" in the telephone company's service area. Clearly the rule has no application to other broadband uses.

tionale of United States v. Terminal Railway Association of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), among others.[12] Briefly stated the antitrust law announced in these cases is that where private individuals have monopolistic control over access to essential resources, they are obligated to make them available to others on equal and non-discriminatory terms. We express no views here as to whether the telephone companies might be compelled, independent of the rules, to furnish facilities to independent CATV operators. Nonetheless even if they were to be required, under the antitrust rule advanced by the Terminal case, supra, to provide CATV services, we are of the opinion that the pole space rule is nonetheless reasonable.

Petitioners agree that if they must furnish service to independent CATV interests, they should do so on equal and non-discriminatory terms. They argue, however, that the pole space requirement goes far beyond what is reasonably necessary to ensure that such terms are satisfied.[13] The alternative to the pole space rule is the so-called "leaseback" arrangement whereby a CATV operator rents a portion of an existing cable owned and operated by the telephone companies.

■ This alternative was deemed unsatisfactory to the Commission. Its broad concern was the development of the entire broadband spectrum, and the telephone companies could effectively thwart that purpose by restricting cable use by CATV lessees to CATV transmissions. Clearly this would have had the effect of perpetuating telephone company control over the development of the broadband. In fashioning its remedy the Commission was guided by antitrust doctrine (see n. 13, supra). We note that a regulatory agency should give consideration to objectives expressed by Congress in other legislation, provided they can be related to the objectives of the statute administered by the agency. City of Chicago v. FPC, 128 U.S.App. D.C. 107, 385 F.2d 629 (1967). And it may, in an "appropriate exercise of the authority delegated to it, select adjudicative guidelines from policy incorporated into statutes not legally binding upon it." Williams v. Washington Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 415 F.2d 922, 960 (1968). Here the Commission has incorporated the adjudicative guidelines of the antitrust laws into its rules; this is an entirely proper exercise of its authority.

■ Where as here the rule is reasonable, in accordance with antitrust doctrines, bears a rational relation to regulatory policy, and may be waived for good cause, it does not violate due process.[14]

12. E. g. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

13. Petitioners appear to argue that the pole space requirement is more stringent than the comparable remedies applied in the Terminal case and others cited n. 11, supra. Even if that were conceded the remedy selected here is entirely consistent with United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). In that case it was held that owing to the company's monopoly power, its lease-only system for distributing its complicated machinery was violative of the antitrust laws and that the company was obliged to offer to sell the machines outright as a precondition to leasing them. The lower court noted "United's power does not rest on predatory practices. Probably few monopolies could produce a record so free from any taint of that kind of wrongdoing. The violation with which United is now charged depends not on moral considerations, but on solely economic considerations." 110 F. Supp. 295, 345 (D.C.Mass.1953). The parallel between United's control over its machinery and the telephone companies' control over their poles is quite clear. Thus, we do not think the Commission selected an inappropriate remedy.

14. Petitioners argue additionally that the rules deprive them of the benefits of their local franchises. By this we do not understand them to mean that their franchise contracts have been unlawfully modified for it is well settled that contract rights

## III. REVIEW OF THE RULES

(1) The rules here in issue were promulgated by the Commission pursuant to the rule-making provision of the Administrative Procedure Act (Section 4, 5 U.S.C. Sec. 553). Petitioners contend that the rules are not supported by adequate evidence in the record and for that reason are invalid. This contention calls for an analysis of the appropriate standard to be applied to the adequacy of the findings in rule-making proceedings.

 It is clear that the findings required of an agency in its rule-making capacity are of a different nature from those required in adjudication (5 U.S.C. Secs. 556 and 557). E. g., California Citizens Band Ass'n v. United States, 375 F.2d 43 (C.A. 9, 1967), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112; Van Curler Broadcasting Corp. v. United States, 48 U.S.App.D.C. 432, 236 F.2d 727 (1956), cert. denied, 352 U.S. 935, 77 S.Ct. 226, 1 L.Ed.2d 163. The relevant standard for rule-making is that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." (5 U.S.C. Sec. 553). In arriving at a policy determination under this procedure the Commission is not bound by the record, but may look beyond it and draw upon its own expertise and experience. Pacific Coast European Conference v. United States, 350 F.2d 197 (C.A. 9, 1965), cert. denied 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362; National Labor Relations Board v. Seven-Up Bottling Co., supra. It is not expected that the agency will discuss in detail every item of fact or opinion included in the comments submitted to it. However, it is expected, if judicial review is to serve its purpose, that the agency's concise general statement of basis and purpose "mandated by Section 4 (5 U.S.C. § 553) will enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." Automotive Parts and Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968). The court's function is at an end once it has determined that the result is reasonable and "within the range of authority conveyed, that it has been formulated in the manner prescribed, and that the disappointed have had the opportunity provided by Congress to try to make their views prevail." Id. at 343. We are satisfied that the Commission in the instant case has met this standard.

The Commission received a large number of comments from interested parties and in fact has summarized their content in its Final Report and Order. It was aware of the history of complaints against carriers by private CATV operators and had previously had occasion to consider the problem in an adjudicatory context. Manatee Cablevision Corp., 22 FCC 2d 841 (1970); Tele-Cable Corp., 19 FCC 2d 574 (1969). Its rationale is clearly stated in its final order such that this court can easily see and understand the major issues of policy which were aired in the proceeding and why the Commission reacted as it did. We are of the opinion that the Commission could reasonably have concluded that prohibition of telephone company-CATV affiliation in the former's service area was required in the public

---

in regulated industries are subject to reasonable modifications. American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966), cert. denied 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75; Air Lines Pilots Ass'n v. Quesada, 276 F.2d 892 (C.A.2, 1960). Rather it appears to be the contention that the rules are an improper bypassing of local franchising authorities. While we have serious reservations about the telephone companies' standing to represent the state and local interests concerned, we emphasize that properly construed the rules do not pro-

pose to regulate CATV systems as such, although one side effect of the rules is to remove from local consideration one category of CATV operations, i. e., by telephone company affiliates. Moreover, the rules are an implementation of national communications policy and thus, ipso facto, there is a legitimate basis for federal pre-emption. See Wire Mire: The FCC and CATV, 79 Harv.L.Rev. 366 (1965). We do not think that the the Commission has unlawfully interfered with the recognized role of local authorities.

interest. Since all procedural requirements for rulemaking were satisfied, the order cannot be deemed defective on this account.[15]

■ (2) Petitioners argue that the rule, which requires discontinuance of CATV service directly or through affiliates within four years (Sec. 63.56) is unjustifiably retroactive in that it compels divestiture of systems acquired prior to promulgation of the rules.[16] Although we find the argument appealing, we nonetheless uphold the Commission on this point.

■ That rules of general application, though prospective in form, may ascribe consequences to events which occurred prior to their issuance does not, on that basis alone, invalidate them. See, e. g., Atlas Tack Corp. v. New York Stock Exchange, 246 F.2d 311, 318–319 (C.A.1, 1957). Where a rule has retroactive effects, it may nonetheless be sustained in spite of such retroactivity if it is reasonable. Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376,

379 F.2d 153 (1967); see SEC v. Chenery Corp., supra.

■ In a complex and dynamic industry such as the communications field, it cannot be expected that the agency charged with its regulation will have perfect clairvoyance. Indeed as Justice Cardozo once said, "Hardship must at times result from postponement of the rule of action till a time when action is complete. It is one of the consequences of the limitations of the human intellect and of the denial to legislators and judges of infinite prevision." Cardozo, The Nature of the Judicial Process 145 (1921). The Commission, thus, must be afforded some leeway in developing policies and rules to fit the exigencies of the burgeoning CATV industry. Where the on-rushing course of events have outpaced the regulatory process, the Commission should be enabled to remedy the problems of undue concentration of control over communications media by retroactive adjustments, provided they are reasonable.

15. Petitioners suggest that they should have been granted a hearing. We cannot agree. The decision to proceed by rule-making rather than by ad hoc adjudication is one "that lies primarily in the informed discretion of the administrative agency. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947). In rule-making there is no constitutional right to a hearing. Alaska Steamship Co. v. FMC, 356 F.2d 59 (C.A.9, 1966). Indeed the kind of issue before the Commission in this case was more readily susceptible to the rule-making mode rather than adjudication. See 1 Davis, Administrative Law Sec. 7.02. When, as here, a new policy is based upon the general characteristics of an industry, "rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them." WBEN, Inc. v. United States, 396 F.2d 601, 613 (C.A.2, 1968) cert. denied, King's Garden, Inc. v. FCC, 393 U.S. 914, 89 S. Ct. 238, 21 L.Ed.2d 200. The Commission was concerned primarily with the future development of broadband cable; that is the kind of issue where experience is worth a year of hearings. See American Airlines, Inc. v. CAB, supra; Pacific

Coast European Conference v. United States, supra.

16. Intervenor Lincoln asserts that the Commission should have grandfathered existing facilities. However, had it done so, it would have been obliged to constantly supervise the grandfathered facilities in order to insure that abuses had not and would not develop. It was precisely this sort of burdensome ad hoc administration that the Commission sought to avoid by promulgating prohibitory rules of general application. If a telephone company can demonstrate that the operation of a CATV system by it or an affiliate in its service area would serve the public convenience and necessity, the new rules provide for waiver of the prohibition. (Secs. 63.55 and 64.602. The Commission is obliged to give full consideration to meritorious applications. WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969); but see United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Federal Power Commission v. Texaco, 373 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). We do not feel that where the Commission seeks to impose a regulatory policy it should be limited to building on the status quo.

Pikes Peak Broadcasting Co. v. FCC, 137 U.S.App.D.C. 234, 422 F.2d 671 (1969).

Admittedly the rule here at issue has an effect on activities embarked upon prior to the issuance of the Commission's Final Order and Report. Nonetheless the announcement of a new policy will inevitably have retroactive consequences. NLRB v. Majestic Weaving Co., 355 F.2d 854 (C.A.2, 1966).[17] The property of regulated industries is held subject to such limitations as may reasonably be imposed upon it in the public interest and the courts have frequently recognized that new rules may abolish or modify pre-existing interests. E. g., California Citizens Band Ass'n v. United States, supra; WBEN, Inc. v. United States, supra; American Airlines, Inc. v. CAB, supra.

 Our decision that the disputed rule is reasonable is facilitated by a finding that reliance by the carriers on the Commission's putative acquiescence in their CATV involvements should not have been great.[18] That such a rule might eventually come into being was signaled as far back as 1956 when a consent decree was entered against the Bell Telephone systems prohibiting affiliation with CATV systems. United States v. Western Electric Co., Civ.Action No. 1749 (D.C.N.J.1956). The issues began to sharpen in 1966 when the Commission directed a group of operating telephone companies to file tariffs covering their CATV channel service offerings. Common Carrier Tariffs for CATV Systems, 4 FCC 2d 257 (1966). When the tariffs had been filed the Commission ordered an investigative hearing into the lawfulness of the tariffs [5 FCC 2d 229 (1966)] and later the inquiry was expanded to include the carriers' pole line attachment policies. In 1967 the Commission dismissed several complaints against certain carriers with respect to anti-competitive practices with the intention of hearing the complaints during the course of the then pending investigation into tariffs. In a separate proceeding the Commission in 1968 ruled that certification under Section 214 would be required for the operation of CATV channel service by telephone companies. General Telephone Company of California, 13 FCC 2d 448 (1968). The clear implication from its order was that the Commission would view with scepticism applications for certification where telephone companies were affiliated with the CATV business proposed to be served. Finally in April 1969 with the Notice of Proposed Rulemaking in this proceeding the possibility that telephone company-CATV affiliations might be prohibited was distinctly present. Under these circumstances it cannot be said that no straws were in the wind prior to the issuance of these rules. In order to avoid undue economic harm the companies have been given four years in which to discontinue their CATV operations, and where good cause can be shown the rules may be waived. Consequently we are of the opinion that the rule must be upheld.

 (3) Finally it is urged that the Commission abused its discretion by failing to show why a lesser remedy ought not to have been applied. In view of our prior finding that the rules are adequately supported we must reject

---

17. Petitioners contend that these rules represent a reversal of prior policy. We cannot accept that interpretation. The Commission has, of course, consistently recognized and encouraged the role of state and local governments in choosing who is to be a CATV operator, but it has not deviated from that position here. While the rules have an indirect effect on local franchising power, they are simply the expression of a new policy with respect to CATV ownership in conformity with the developing standard of public convenience and necessity.

18. However, even where reliance is strong, regulations may be altered retroactively. See Dixon v. United States, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1964). Indeed very substantial reliance is sometimes disregarded. See United States v. E. I. du Pont de Nemours, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1956) (Stock ownership in automobile manufacturer deemed violative of Sec. 7 Clayton Act despite nearly 40 years of acquiescence by Federal Trade Commission.)

this argument. Particularly where the choice of remedy is involved the courts must pay special deference to the administrative agency's expertise. Our inquiry is limited to ascertaining whether on the basis of the evidence before it, the Commission promulgated rules reasonably calculated to effectuate the policies of the Communications Act. United Steelworkers of America v. NLRB, 126 U.S.App.D.C. 215, 376 F.2d 770 (1967), cert. denied, Northwest Engineering Co. v. NLRB, 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285. It is an established rule that the judiciary must give deference to the choice of remedy selected by the agency unless it reflects an abuse of discretion so gross as to be arbitrary. Consolo v. FMC, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); FCC v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946). The Commission has not here abused its discretion.[19]

For the foregoing reasons the order of the Commission is hereby affirmed.

19. Intervenor Lincoln suggests that the rules are an abuse of discretion because they catch the innocent as well as the guilty. This overlooks the fact that the rules represent a policy choice, not a rectification of specific past evils. That the guiltless may be affected by administrative regulation is too well settled to require further comment. See FCC v. WOKO, supra.