**GEORGIA POWER PROJECT, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 74–4164.**

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1977.

---

5. This issue of whether there was an illegal seizure is presently awaiting decision by the Fifth Circuit.

Harvey J. Shulman, Thomas R. Asher, Collot Guerard, Washington, D. C., for petitioner.

Stephen A. Sharp, Atty., F. C. C., Robert B. Nicholson, Anti-Trust Div., Dept. of Justice, Washington, D. C., for respondents.

Daniel M. Armstrong, Assoc. Gen., Werner K. Hartenberger, Gen. Counsel, F. C. C., Washington, D. C., for Fuqua Television.

Daniel J. Conway, Dept. of Justice, Washington, D. C., for Pacific & Southern Co.

Before WISDOM, SIMPSON and TJOFLAT, Circuit Judges.

PER CURIAM:

This case arises under the Federal Communication Commission's ("FCC" or "Commission") fairness doctrine. Under this doctrine when a broadcast station presents programming on one side of a controversial issue of public importance, a reasonable opportunity for the presentation of opposing views must be provided. The controversy arose when the petitioner complained to the FCC that a series of spots sponsored by the Georgia Power Company and repeatedly broadcast by the licensees of WJBF–TV and WQXI–TV (now WXIA–TV) gave rise to fairness doctrine obligations. The petitioner, Georgia Power Project, contended that these broadcasts presented one side of a controversial issue of public importance, namely the power company's rate increase requests then pending before the Georgia Public Service Commission ("PSC").

## I.

Over a period of two and one half years, the FCC issued three separate decisions concerning petitioner's fairness doctrine complaint. With respect to the advertisements at issue in this petition for review,

(ads A–2 through A–5[1]), the FCC in its initial decision *Media Access Project*, 44 F.C.C.2d 755 (1973), stated that it would not rule on the applicability of the fairness doctrine. The Commission noted, however, that the advertisements arguably asserted the need for an increase in generating capacity and thus also advocated one side of the rate increase issue. The Commission did find that two additional advertisements sponsored by the power company, A–1 and A–10, had directly and specifically advocated the rate increase and that the licensees had not afforded a reasonable opportunity for the presentation of opposing viewpoints. The Commission therefore directed the licensees to submit, within seven days of the decision, a statement indicating what additional material they had broadcast or intended to broadcast in the near future that would afford opportunity for the presentation of contrasting views on the rate increase issue. In response to the initial FCC decision, both licensees submitted descrip-

tions of the broadcasting which they contended was sufficient to satisfy the fairness doctrine obligations found by the FCC in its initial decision.

After evaluating these responses, the FCC issued its second decision, Fuqua Television, Inc., 49 F.C.C.2d 233 (1974) (Fuqua), in which it concluded that the licensees had afforded a reasonable opportunity for the presentation of viewpoints contrasting with those contained in announcements A–1 and A–10. With regard to ads A–2 through A–5, however, the FCC concluded that WJBF and WQXI were not unreasonable in concluding that the advertisements did not present arguments on one side of the rate increase controversy. The FCC's determination—that the ads were not "devoted in an obvious and meaningful way to the discussion of" the rate increase issue—was based on an interpretation of the fairness doctrine which had been adopted by the FCC three months earlier. Fairness Rep., 48 F.C.C.2d, 1, 12, 13, 22–24 (1974).

1. Ads A–2 through A–5 read as follows:

A–2

(Audio)—Chris is one year old. In his lifetime he'll experience love, independence, and morning gold with sunshine.

In that lifetime Chris may need a million kilowatt-hours of electricity. Along with more than 90,000 babies born in Georgia last year he'll continue using it, needing it, in ever increasing amounts. That's why Georgia Power must double its generating capacity by the year 1978 . . . and it took us over 40 years to build the system we have today. This year we'll have to spend near two million dollars every working day for construction.

A–3

(Audio)—You're feeling the pulse beat of a modern electric hospital. People struggling for life with the help of . . . Electrocardiograms . . . Electric Fluoroscopes . . . Electric Iron Lungs . . . Electric Operating Lights . . . (Sound: Baby crying) . . . Electric Incubators.

As the population grows, so does the need for hospital facilities. That's another reason Georgia Power must spend nearly $2 million every working day, just for construction. To serve your growing needs.

A–4

(Video)—Water glass with one straw. Straws are added one by one. Last straw is added as glass almost empties.

(Audio)—Funny thing about electricity. Just when you think you've got enough for everybody. Everybody wants more. For New Schools, New Hospitals, New Office Buildings, New Shopping Centers, New Air and Water Purification Equipment, Better Lighting for Our Street. And for the Thousands of New Homes and Apartments built in Georgia every year.

That's why Georgia Power must build today to provide the kinds of generating facility necessary to satisfy your growing demands. Otherwise, there just might not be enough power to go around.

And that would really be the last straw. The Georgia Power Company.

A–5

(Audio)
(Sound: Typing)
Do you know what your son saw in school today? A herd of charging elephants.

Through a motion picture projector.
He saw a living cell divide. Through an electric microscope.
He watched a computer_____estimate world population changes.
(Sound: Typing)
He printed a newspaper.
He heard a Spaniard reciting from Don Quixote . . . with the help of a tape recorder.

Subsequently, on December 16, 1974, the petitioner filed the instant petition for review and simultaneously moved this Court for leave to present newly discovered evidence before the FCC.

The Court, on January 28, 1975, granted petitioner's motion solely with respect to one item of evidence described as a report of a telephone conversation between a representative of Georgia Power Company and a representative of WJBF. Thereafter, in a third decision, *Fuqua Television, Inc.*, (July 30, 1976), the Commission considered the additional evidence which the petitioner was permitted to present by virtue of an order of this Court. After reviewing the report adduced by petitioner, the Commission reaffirmed its second decision.

## II.

The petitioner argues [2] that the failure on the part of the FCC to find that advertisements A–2 through A–5 presented only one side of a controversial issue of public importance was arbitrary and capricious. We disagree and affirm the Commission's finding.

As the Commission did not have a definite standard by which to gauge broadcasts that treated issues implicitly rather than explicitly, the Commission refined its policy in the context of an extensive, open policy inquiry. See Fairness Report, 48 F.C.C.2d 1 (1974). In this report, the Commission made clear that:

> . . . what we are really concerned with is an obvious participation in public debate and not a subjective judgment as to the advertiser's actual intentions. Accordingly, we expect our licensees to do nothing more than to make a reasonable, common sense judgment as to whether the "advertisement" presents a meaningful statement which obviously addresses, and advocates a point of view on, a controversial issue of public importance.

48 F.C.C.2d at 23. As the Commission pointed out, id. at 24, this judgment may be a difficult one on which individual licensees might well differ. Consequently, the Commission declared it would "not rule against the licensee unless the facts are so clear that the *only reasonable conclusion* would be to view the 'advertisement' as a presentation on one side of a specific public issue." Id. (Emphasis added).

Furthermore our review of the Commission's determination is limited. See *Permian Basin Area Rate Cases*, 1968, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312; *Greater Boston TV Corp. v. F.C.C.*, 143 U.S. App.D.C. 383, 444 F.2d 841, 851, *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 201 (1971). *See also General Telephone Co. of Southwest v. United States*, 5 Cir. 1971, 449 F.2d 846, 858–59. Thus in the present context, where the Commission upholds the licensee's judgment, it will be a rare case indeed when reversal is warranted. We cannot, in the instant case, say that the Commission's determination that a reasonable licensee could find that advertisements A–2 through A–5 did not advocate one side of a controversial issue of public importance was arbitrary and capricious.

We might note in conclusion, however, that the procedure by which the Commission ruled on advertisements A–2 through A–5, is improper and, we trust, will not be repeated. The purpose of the second decision, *Fuqua Television* (Fuqua I), was to evaluate whether the licensees had afforded a reasonable opportunity for the presentation of viewpoints contrasting with those contained in advertisements A–1 and A–10. The gratuitous ruling on advertisements A–2 through A–5, coming without advance notice to the parties that this issue was still alive, is improper although in these circumstances the error was harmless. Section 10 Administrative Procedure Act, 5 U.S.C. § 706.

The Petition for Review is DENIED.

---

2. We have also considered the FCC's claim of mootness and petitioner's additional claims that the FCC departed from prior pronouncements on the fairness doctrine's application to editorial advertising and that the FCC improperly interpreted the Court's order concerning supplementary evidence and find these claims are without merit.